## NOTO *v.* UNITED STATES.

No. 9.   Argued October 10–11, 1960.—Decided June 5, 1961.

*John J. Abt* argued the cause and filed a brief for petitioner.

*Kevin T. Maroney* and *John F. Davis* argued the cause for the United States.   With *Mr. Maroney* on the brief were *Solicitor General Rankin* and *Assistant Attorney General Yeagley.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case, like No. 1, *Scales* v. *United States, ante,* p. 203, was brought here to test the validity of a conviction under the membership clause of the Smith Act. 361 U. S. 813. The case comes to us from the Court of Appeals for the Second Circuit which affirmed petitioner's conviction in the District Court for the Western District of New York, after a jury trial. 262 F. 2d 501.

The only one of petitioner's points we need consider is his attack on the sufficiency of the evidence, since his statutory and constitutional challenges to the conviction are disposed of by our opinion in *Scales;* and consideration of his other contentions is rendered unnecessary by the view we take of his evidentiary challenge.

In considering that challenge we start from the premise that Smith Act offenses require rigorous standards of proof. *Scales, ante,* p. 230. We find that the record in this case, which was tried before our opinion issued in *Yates* v. *United States,* 354 U. S. 298, bears much of the infirmity that we found in the *Yates* record, and requires us to conclude that the evidence of illegal Party advocacy was insufficient to support this conviction.

A large part of the evidence adduced by the Government on that issue came from the witness Lautner, and the reading of copious excerpts from the "communist classics." This evidence, to be sure, plentifully shows the Party's teaching of abstract doctrine that revolution is an inevitable product of the "proletarian" effort to achieve communism in a capitalist society, but testimony as to happenings which might have lent that evidence to an inference of "advocacy of action" to accomplish that end during the period of the indictment, 1946–1954, or itself supported such an inference, is sparse indeed. Moreover, such testimony as there is of that nature was not broadly based, but was limited almost exclusively to Party doings

in western New York, more especially in the cities of Rochester and Buffalo, the scene of petitioner's principal Party activities. Further, the showing of illegal Party advocacy lacked the compelling quality which in *Scales, ante,* p. 203, was supplied by the petitioner's own utterances and systematic course of conduct as a high Party official. We proceed to a summary of this testimony.

The witness Dietch described mainly episodes from his indoctrination as a member of the Rochester Young Communist League during the years 1935–1938. In that time he knew petitioner, with whom he had gone to high school, and testified that petitioner, then a youth, was an active and convinced member of the League. Apart from those early years, Dietch's testimony as to the Party and the petitioner referred to one other possibly relevant episode, when, in 1951, he obtained for the Party at petitioner's request two pieces of special printing equipment for which petitioner paid $100 and $200. However, this episode is deprived of significance when it appears from the witness' testimony that petitioner explained to him at the time that pressure brought to bear on the Party had made it difficult for it to get its printing done by conventional commercial means.

The witness Geraldine Hicks had joined the Party in 1943 at the request of the F. B. I. and continued to be involved with it until 1953. She knew petitioner in connection with his work as Chairman of the Erie County Communist Party from 1946 until 1950. Her testimony related to classes and meetings which she attended in the Buffalo area, where the "communist classics" were used for teaching purposes. Extensive passages from these works were read into evidence. She also testified as to the importance attributed by the local Party to its "industrial concentration" work and to its recruitment of workers

in those industries as well as to the importance attributed to the recruitment of Negroes.

The witness Chatley, who was a bus driver during the period of his Communist Party membership from 1949 onwards, testified to his contacts with petitioner and other Party members in the Buffalo area. He testified to Party teachings as to the importance of receiving solid support from the labor unions. He was given various items of literature such as the History of the Russian Revolution and The Proletarian Revolution and the Renegade Kautsky, which latter dealt with an early Communist who had been singled out for condemnation because of his views that communism could be achieved ultimately by peaceful means. He was told by petitioner that "if I would re-read the book[s], most of my questions would be answered. He said if there were any points I did not understand he would be happy to clear them up at a later visit." Perhaps the most significant item of Chatley's testimony dealt with an interview with petitioner, at which Chatley was requested to hide out a Party member who was fleeing the F. B. I. in connection with "what the newspapers called this Atom Spy Ring business." So far as the record reveals, the plans never progressed beyond this request. The petitioner had also told Chatley that the Federal Government was building concentration camps:

> ". . . He said they are not building them for ornamental purposes. He said 'They are going to fill them with our people, starting with the leaders.' . . . He said that he expected when they were ready he would be one of the first people to go. He said the Federal Government would continue with these camps and fill them with a lot of people, but the time would come when there would be a show-down,

working people will stand just so much. It might take several years, it will result in bad times, but in the end it will result in a turn in the country to Marxism and Leninism. He said then his part might be in it, he was willing to suffer anything to bring it to that glorious end."

Certainly the most damaging testimony came from the witness Regan, who as a government agent and Party member from 1947 in the Buffalo-Rochester area gathered considerable information on the Party's "industrial concentration" program in that area. Regan, at the request of petitioner, attended a Party meeting in New York City on creating a Party commission in the United Auto Workers. The conference concerned the penetration of the United Auto Workers, and plans were made for getting people into various shops in automobile plants in the State, who could later assume positions of leadership in the union. At a later date petitioner also discussed the penetration of an automobile plant in the area by Party members sent up from New York City. Regan also received a pamphlet, but not from the petitioner, dealing with the concentration program in the steel industry. The pamphlet stated at one point:

"1. Three basic industries, steel, railroad, and mining. These are basis [sic] to the National economy, that is if any one or all three are shut down by strike our economy is paralyzed. It is necessary for a Marxist revolutionary party to be rooted in these industries."

In 1949 Regan attended a conference in Rochester at which the petitioner spoke: "He discussed concentration work, and he said the task of the Party was to build the Party within the shop in Buffalo . . . he specifically mentioned both steel and Westinghouse Electric." Another speaker said that "steel industry was a basic indus-

try, by basic industry he said the entire section of industry within the country depended on steel." Regan also attended a conference in New York City at which petitioner spoke:

> ". . . He said a Lenin method of work within the shop was to decide upon the particular dependent within the shop, that the shop as a rule depended upon, to suspend production, it was the job of every communist to know the people, executives and product of the company, if possible to direct his attention on the key department, better still, to get a job in the key department."

Several other passages in Regan's testimony should be adverted to for their bearing on the tone of the record before us. Speaking of the war in Korea, Regan testified that the petitioner had said at the conference of the Upstate District of the Party in 1950:

> ". . . the war . . . was caused by an aggressive action of the United States, American troops would follow Wall Street policy. He said it is possible for this to break out in other parts of the world. He mentioned the near East.
> "Q. Is that all?
> "A. Yes."

No effort was made to link up this conference with particularly trusted Party members, but it does appear that it was at this conference that plans were laid for building a Communist Party club "on the railroad."

Regan also testified to a remark made at another Party conference by a lecturer that a "social democrat was an evolutionist who waited for socialism where the Communist Party would achieve socialism through revolutions." At this same meeting the lecturer recounted an incident

that had occurred at a class she had once taught in New Rochelle, New York, at an unspecified time:

> ". . . She said a person at this class, they were discussing the Soviet Union, asked her would it be possible for him to own twenty pairs of shoes in the Soviet Union. She made the statement he was the kind of a guy they hoped to shoot some day."

The witness recalled a similar intemperate remark by the petitioner during a meeting in 1947:

> "Lumpkin [a Party member] was talking about a visit to his home by a local newspaper reporter. He said the reporter came to his home. They let him in and answered a lot of questions. . . ."

> "John Noto said Lumpkin should never let the reporter into the house. Should not have answered any questions. He said 'Sometime I will see the time we can stand a person like this S. O. B. against the wall and shoot him.'"

The witness Greenberg testified largely about the Party program in the upstate area as to setting up printing and mimeographing equipment in case commercial channels were cut off or the Party was forced underground; and three other witnesses testified briefly to the effect that they had known petitioner when he had moved to Newark, New Jersey, and obtained a job under an assumed name as a helper or stockkeeper in the Goodyear Rubber Products Corporation factory, in connection with which he used a false Social Security number.

Finally, there was testimony through the witness Lautner as to the Party's underground organization in northern New York, including petitioner's participation therein as one of the three Party members in charge.

We must consider this evidence in the light most favorable to the Government to see whether it would support

the conclusion that the Party engaged in the advocacy "not of . . . mere abstract doctrine of forcible overthrow, but of action to that end, by the use of language reasonably and ordinarily calculated to incite persons to . . . action" immediately or in the future. *Yates* v. *United States, supra,* at 316. In that case we said:

> ". . . The essence of the *Dennis* holding was that indoctrination of a group in preparation for future violent action, as well as exhortation to immediate action, by advocacy found to be directed to 'action for the accomplishment' of forcible overthrow, to violence as 'a rule or principle of action,' and employing 'language of incitement' . . . is not constitutionally protected . . . . This is quite a different thing from the view of the District Court here that mere doctrinal justification of forcible overthrow, if engaged in with intent to accomplish overthrow, is punishable *per se* under the Smith Act. That sort of advocacy, even though uttered with the hope that it may ultimately lead to violent revolution, is too remote from concrete action to be regarded as the kind of indoctrination preparatory to action which was condemned in *Dennis.* As one of the concurring opinions in *Dennis* put it: 'Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.' " *Id.,* at 321–322.

The great bulk of the evidence in this record seems to us to come within the purview of the first of the contrasted alternatives elaborated in the concurring opinion in *Dennis* v. *United States,* 341 U. S. 494, 545, and referred to in the passage just quoted. We held in *Yates,* and we reiterate now, that the mere abstract teaching of Communist

theory, including the teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action. There must be some substantial direct or circumstantial evidence of a call to violence now or in the future which is both sufficiently strong and sufficiently pervasive to lend color to the otherwise ambiguous theoretical material regarding Communist Party teaching, and to justify the inference that such a call to violence may fairly be imputed to the Party as a whole, and not merely to some narrow segment of it.

Surely the offhand remarks that certain individuals hostile to the Party would one day be shot cannot demonstrate more than the venomous or spiteful attitude of the Party towards its enemies, and might indicate what could be expected from the Party if it should ever succeed to power. The "industrial concentration" program, as to which the witness Regan testified in some detail, does indeed come closer to the kind of concrete and particular program on which a criminal conviction in this sort of case must be based. But in examining that evidence it appears to us that, in the context of this record, this too fails to establish that the Communist Party was an organization which presently advocated violent overthrow of the Government now or in the future, for that is what must be proven. The most that can be said is that the evidence as to that program might justify an inference that the leadership of the Party was preparing the way for a situation in which future acts of sabotage might be facilitated, but there is no evidence that such acts of sabotage were presently advocated; and it is *present* advocacy, and not an intent to advocate in the future or a conspiracy to advocate in the future once a groundwork has been laid, which is an element of the crime under the membership clause. To permit an inference of present advocacy from evidence

showing at best only a purpose or conspiracy to advocate in the future would be to allow the jury to blur the lines of distinction between the various offenses punishable under the Smith Act.

The kind of evidence which we found in *Scales* sufficient to support the jury's verdict of present illegal Party advocacy is lacking here in any adequately substantial degree. It need hardly be said that it is upon the particular evidence in a particular record that a particular defendant must be judged, and not upon the evidence in some other record or upon what may be supposed to be the tenets of the Communist Party. See *Yates, supra,* at 330.

Although our conclusion renders unnecessary consideration of the evidence as to petitioner's personal criminal purpose to bring about the overthrow of the Government by force and violence, a further word may be desirable. While evidence of the industrial concentration program, in which petitioner was active, does not alone justify an inference of the Party's present advocacy of violent overthrow, it may very well tend to show the quite different element of the petitioner's own purpose. Even though it is not enough to sustain a conviction that the Party has engaged in "mere doctrinal justification of forcible overthrow . . . [even] with the intent to accomplish overthrow," *Yates, supra,* at 321, it would seem that such a showing might be of weight in meeting the requirement that the particular defendant in a membership clause prosecution had the requisite criminal intent. But it should also be said that this element of the membership crime, like its others, must be judged *strictissimi juris,* for otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and con-

stitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.

In view of our conclusion as to the insufficiency of the evidence as to illegal Party advocacy, the judgment of the Court of Appeals must be

*Reversed.*

Mr. Justice Brennan and The Chief Justice would remand to the District Court with direction to that court to dismiss the indictment.   For the reasons expressed in Mr. Justice Brennan's dissent in *Scales* v. *United States, ante,* p. 278, they believe that this prosecution was barred by § 4 (f) of the Internal Security Act.   They also believe that the dismissal is required because of the insufficiency of the evidence.

Mr. Justice Black, concurring.

In 1799, the English Parliament passed a law outlawing certain named societies on the ground that they were engaged in "a traitorous Conspiracy . . . in conjunction with the Persons from Time to Time exercising the Powers of Government in *France* . . . ." [1]   One of the many strong arguments made by those who opposed the enactment of this law was stated by a member of that body, Mr. Tierney:

> "The remedy proposed goes to the putting an end to all these societies together.   I object to the system, of which this is only a branch; for the right hon. gentleman has told us he intends to propose laws from time to time upon this subject, as cases may arise to require them.   I say these attempts lead to

---

[1] 39 George III, c. 79.   For a more complete discussion of the provisions of this law and the arguments surrounding its enactment, see my dissenting opinion in *Communist Party* v. *Subversive Activities Control Board,* decided today, *ante,* p. 1, at 151–154, 162.

consequences of the most horrible kind. I see that government are acting thus. Those whom they cannot prove to be guilty, they will punish for their suspicion. To support this system, we must have a swarm of spies and informers. They are the very pillars of such a system of government." [2]

The decision in this case, in my judgment, dramatically illustrates the continuing vitality of this observation.

The conviction of the petitioner here is being reversed because the Government has failed to produce evidence the Court believes sufficient to prove that the Communist Party presently advocates the overthrow of the Government by force. The Government is being told, in effect, that if it wishes to get convictions under the Smith Act, it must maintain a permanent staff of informers who are prepared to give up-to-date information with respect to the present policies of the Communist Party. Given the fact that such prosecutions are to be permitted at all, I do not disagree with the wisdom of the Court's decision to compel the Government to come forward with evidence to prove its charges in each particular case. But I think that it is also important to realize the overriding pre-eminence that such a system of laws gives to the perpetuation and encouragement of the practice of informing—a practice which, I think it is fair to say, has not always been considered the sort of system to which a wise government

---

[2] See Parliamentary Debates, Hansard, 1st Series, 34, at 991. Cf. *De Jonge* v. *Oregon*, 299 U. S. 353, 365: "The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

would entrust the security of a Nation. I have always thought, as I still do think, that this Government was built upon a foundation strong enough to assure its endurance without resort to practices which most of us think of as being associated only with totalitarian governments.

I cannot join an opinion which implies that the existence of liberty is dependent upon the efficiency of the Government's informers. I prefer to rest my concurrence in the judgment reversing petitioner's conviction on what I regard as the more solid ground that the First Amendment forbids the Government to abridge the rights of freedom of speech, press and assembly.

MR. JUSTICE DOUGLAS, concurring.

The utterances, attitudes, and associations in this case, like those in *Scales* v. *United States, ante,* p. 203, are in my view wholly protected by the First Amendment and not subject to inquiry, examination, or prosecution by the Federal Government.

For that reason, as well as for the one mentioned by MR. JUSTICE BRENNAN, I would remand the case to the District Court with directions to dismiss the indictment.