The **UNITED STATES** of America

v.

**Dr. Albert Emanuel BLUMBERG.**

**Crim. No. 17963.**

United States District Court
E. D. Pennsylvania.
June 29, 1962.

Drew J. T. O'Keefe, U. S. Atty., Edward F. Kane, Asst. U. S. Atty., Philadelphia, Pa., and Vincent P. Macqueeney, Atty., Dept. of Justice, for plaintiff.

Michael von Moschzisker, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

Defendant was convicted by the verdict of a jury under the so-called membership clause of the Smith Act. 18 U.S.C. § 2385. That Act, among other things, makes a felony the acquisition or holding of membership in any organization which advocates the overthrow of the Government of the United States by force or violence with knowledge of its purposes.[1] The indictment charged that from July 26, 1945, to the date of its filing (October 6, 1954) the Communist Party of the United States was such an organization, and that defendant throughout that period was a member thereof, with knowledge of the Party's illegal purpose and a specific intent to accomplish overthrow "as speedily as circumstances would permit."

The case is before us on defendant's motions for judgment of acquittal, or, in the alternative, for a new trial. We need only consider defendant's attack on the sufficiency of the evidence and his allegations of trial and procedural errors, since his statutory and constitutional challenges to the conviction are now disposed of by the decision in Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961).

■ In considering the sufficiency of the evidence, we start from the premise that Smith Act offenses, involving as they do subtler elements than are present in most other crimes, require rigorous standards of proof. Scales, p. 232, 81 S.Ct. 1469; Noto v. United States, 367

U.S. 290, 291, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961). It will contribute to a better understanding and evaluation of the evidence if we refer in some detail to the standards of proof laid down in Scales and Noto, supra, the Supreme Court's first review of convictions under the membership clause of the Smith Act. In Scales, the Court noted with approval the premises upon which that case was submitted to the jury (367 U.S. p. 220 81 S.Ct. p. 1481):

"The jury was instructed that in order to convict it must find that within the three-year limitations period (1) the Communist Party advocated the violent overthrow of the Government, in the sense of present 'advocacy of action' to accomplish that end as soon as circumstances were propitious; and (2) petitioner was an 'active' member of the Party, and not merely 'a nominal, passive, inactive or purely technical' member, with knowledge of the Party's illegal advocacy and a specific intent to bring about violent overthrow 'as speedily as circumstances would permit.'"

■ The Court pointed out in Scales that the evidentiary question there was controlled in large part by Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), which was a conspiracy prosecution under the Smith Act. Yates makes abundantly clear the distinction between advocacy of abstract doctrine and advocacy directed at promoting unlawful action, pp. 318–322, 77 S.Ct. 1064. "The essential distinction is that those to whom the advocacy is addressed must be urged to *do* something, now or in the future, rather than merely to *believe* in something," pp. 324–325, 77 S.Ct. p. 1080. In Yates, it was

[1]. The third paragraph of section 2385, with the membership clause emphasized, reads: "Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government [government of the United States or the gov-

ernment of any State, Territory, District or Possession thereof, or the government of any political subdivision therein] by force or violence; *or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof * * *.*"

further said, pp. 320–322, 77 S.Ct. p. 1078:

" * * * The essence of the Dennis [v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137] holding was that indoctrination of a group in preparation for future violent action, as well as exhortation to immediate action, by advocacy found to be directed to 'action for the accomplishment' of forcible overthrow, to violence as 'a rule or principle of action,' and employing 'language of incitement,' * * * is not constitutionally protected * * *. This is quite a different thing from the view of the District Court here that mere doctrinal justification of forcible overthrow, if engaged in with the intent to accomplish overthrow, is punishable per se under the Smith Act. That sort of advocacy, even though uttered with the hope that it may ultimately lead to violent revolution, is too remote from concrete action to be regarded as the kind of indoctrination preparatory to action which was condemned in Dennis. As one of the concurring opinions in Dennis put it: 'Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.' "

In Scales, the Court referring to the Yates opinion, indicates what type of evidence is needed to permit a jury to find that (a) there was "advocacy of action" and (b) the Party was responsible for such advocacy, 367 U.S. pp. 232–235, 81 S.Ct. p. 1488:

"First Yates makes clear what type of evidence is not *in itself* sufficient to show illegal advocacy. This category includes evidence of the following: the teaching of Marxism-Leninism and the connected use of Marxist 'classics' as textbooks; the official general resolutions and pronouncements of the Party at past conventions; dissemination of the Party's general literature, including the standard outlines on Marxism; the Party's history and organizational structure; the secrecy of meetings and the clandestine nature of the Party generally; statements by officials evidencing sympathy for and alliance with the U. S. S. R. * * * However, this kind of evidence, while insufficient in itself to sustain a conviction, is not irrelevant. Such evidence, in the context of other evidence, may be of value in showing illegal advocacy.

"Second, the Yates opinion also indicates what kind of evidence is sufficient. There the Court pointed to two series of events which justified the denial of directed acquittals as to nine of the Yates defendants. The Court noted that with respect to seven of the defendants, meetings in San Francisco which were described by the witness Foard might be considered to be 'the systematic teaching and advocacy of illegal action which is condemned by the statute.' 354 U.S. at 331, [77 S.Ct. at 1083.] In those meetings, a small group of members were not only taught that violent revolution was inevitable, but they were also taught techniques for achieving that end. For example, the Yates record reveals that members were directed to be prepared to convert a general strike into a revolution and to deal with Negroes so as to prepare them specifically for revolution. In addition to the San Francisco meetings, the Court referred to certain activities in the Los Angeles area 'which might be considered to amount to "advocacy of action" ' and with which two Yates defendants were linked. Id., 331–332 [77 S.Ct. 1083]. Here again, the participants did not stop with teaching of the inevitability of eventual revolution, but went on to explain techniques, both legal and illegal, to be employed in preparation for or in connection with the revolution.

Thus, one member was 'surreptitiously indoctrinated in methods * * * of moving "masses of people in time of crisis"'; others were told to adopt such Russian prerevolutionary techniques as the development of a special communication system through a newspaper similar to Pravda. Id., 332 [77 S.Ct. 1083]. Viewed together, these events described in Yates indicate at least two patterns of evidence sufficient to show illegal advocacy: (a) the teaching of forceful overthrow, accompanied by directions as to the type of illegal action which must be taken when the time for the revolution is reached; and (b) the teaching of forceful overthrow, accompanied by a contemporary, though legal, course of conduct clearly undertaken for the specific purpose of rendering effective the later illegal activity which is advocated. Compare Noto v. United States, post [367 U.S. 290] at 297–299 [81 S.Ct. 1517, 6 L.Ed.2d 836].

"Finally, Yates is also relevant here in indicating, at least by implication, the type and quantum of evidence necessary to attach liability for illegal advocacy to the Party. In discussing the Government's 'conspiratorial-nexus theory' the Court found that the evidence there was insufficient because the incidents of illegal advocacy were infrequent, sporadic, and not fairly related to the period covered by the indictment. In addition, the Court indicated that the illegal advocacy was not sufficiently tied to officials who spoke for the Party as such."

With these criteria in mind, we proceed to an examination of the evidence. Here, as in both Scales and Yates, one of the Government's basic witnesses was Lautner, who testified from the background of high-level participation in Party affairs from 1929 to 1950. Lautner testified that he attended a Party

training school in New York for about three months in 1930, where he was instructed by Party leaders in the following subject matters:

"The History of the Russian Revolution and the Communist International; Leninism; the Decisions of the Sixth World Congress of the Communist International; Political Economy; Dialectial Materialism; The Paris Commune; The Communist Manifesto; Communist Party Problems; subject matter on administrative work; and numerous lectures on various topics." [2]

Following completion of this course, Lautner was assigned to Detroit, Michigan, where he taught classes in the theory of Marxism-Leninism, and in his activities was "giving and showing an example how to translate the teachings of Marxism-Leninism into activities in that given district."

Lautner testified that from April, 1936, until the end of 1940, he served as District Organizer for the District of West Virginia, and thus described his duties:

"First, to represent the Central Committee of the Communist Party in West Virginia; to give leadership to all Party activities in that State; to carry out the Party campaigns in West Virginia; to build the Party in that State, particularly in the basic industries like mining; to build the Party mass organizations; to build the influence of the Communist Party in the miners' unions down there; to see to it that resolutions and the Party policies are reflected in the conventions of the labor unions down there on various issues that the Party is raising; to develop a District Committee." [3]

During this period, Lautner testified, he attended Central Committee meetings in New York City twice a year, where he met the defendant, who was at that time Organizer for the District of Maryland. The witness recalled that at one of these meetings Stachel, Executive

**2.** Notes of testimony, p. 617.

**3.** Notes of testimony, p. 719.

Secretary of the Central Committee, "gave a report on the need and necessity for Party leaders to editorially acquaint themselves with the basic writings of Marx, Engels, Lenin and Stalin, to deepen their understanding on Marxism-Leninism, and as a result of that the quality of work of the Party leaders will be tremendously improved."

In 1941, Lautner was sent to the National Training School in New York, where seven Party functionaries from various sections of the eastern part of the United States were given instruction by Party leaders in Marxism-Leninism and other subjects. Dr. Mandel, School Director of the Communist Party, was in charge of the school, which began about the middle of January, 1941, and continued until early the following May. Classes met "in various places in New York City; in a different place from day to day." The textbooks included the so-called Marxist "classics" and more modern Party literature. The Government's counsel read into evidence lengthy passages from these works, and Lautner testified, following each passage, that he had been so taught at the Training School. These excerpts, in the main, dealt with the necessity for violent overthrow of the capitalist structure. Asked if he could recall any discussion by his instructors on this subject, Lautner stated:

"Well, it was in the class of Marxism-Leninism taught by George Siskind and in his discussion, in substance, he said that the transition from capitalism to socialism in the United States must be a direct one. The United States being one of the most powerful, the most powerful imperialist country, the imperialists who own the wealth of the nation will not readily, and who own the power in the nation will not readily yield that power, therefore, it must be wrested from them, it must be taken away from them, and the transition from capitalism to social-ism will be through the proletarian revolution and the dictatorship of the proletariat. He said that this transition is a direct one; there are no intermediary steps like in instances of colonial revolutionary situations, and he reemphasized, said numerous times, that being the most powerful imperialist country in the world there is no other way than to wrest power through the proletarian revolution and setting up of the dictatorship of the proletariat in the United States." [4]

Lautner testified that, in the context of Siskind's discussion, he understood that "wrest" meant "to take away by force." The witness stated he was taught that two conditions must prevail for a successful transition from capitalism to socialism via the proletarian revolution and the dictatorship of the proletariat:

"One of the conditions, set of conditions, is when imperialism is in a state of turmoil, when the state apparatus cannot exert its power by the established and practiced means, when there is a governmental crisis, there is a deep economic crisis or a war situation, where large sections of the population are dissatisfied and not influenced any more by the state and its institution. When a combination of this one set of circumstances prevail—and in addition to that, there is a powerful Communist Party, not necessarily numerically strong but an influential, powerful Communist Party that has decisive influence and control over large sections, particularly decisive sections of the industrial proletariat; in addition to that it has sections of the national minorities; in addition to that it neutralized sections of the middle classes. When these two sets of conditions or combinations of them exist, that is the situation when we are at the eve, on the eve of the proletarian revolution and the dictatorship of the proletariat." [5]

4. Notes of testimony, p. 764.

5. Notes of testimony, p. 768.

In this same course at the National Training School in 1941, the students were thoroughly grounded in the concept of "Democratic Centralism," which Lautner defined as follows:

"Democratic centralism means a concept of organization. Decisions are made by higher bodies in the organization. These decisions are obligatory on all members in the lower organizations of that particular higher body that made the decision. Whether one agrees or disagrees with these decisions is important in this sense: that if one disagrees they have to carry out the decisions anyway, and they can take exceptions to those decisions after the decision is carried out." [6]

Following his completion of this course, Lautner was appointed to the National Group Commission of the Party, an assignment to which he returned in 1945 after service in the Army. The Party was then known as the Communist Political Association. Lautner testified that he attended the National Convention in New York City in 1945, when the revisionist errors under Browder were repudiated, a report dealing with the return to the classics was accepted unanimously and the Party was reconstituted as the Communist Party of the United States of America.

Lautner testified that, following the 1945 Convention, he taught classes in various places in New York City, in such subjects as Marxism-Leninism, Democratic Centralism, Party Structure, etc., using the "classic works" as texts. He added that "these were classes of section functionaries and branch organizers and of Party functionaries in the trade union movement." The witness gave the reason for these classes:

"Because after the reconstitution of the Party, one of the key programs worked out for the Party and by the Party was the reindoctrination of the whole Party membership on all levels to eradicate any vestiges of Browderism in the ranks of the Party, and New York County had a whole series of classes, New York State organized similar classes, and the education was going on on all levels, so that is how I came to teaching some of these classes." [7]

Lautner was engaged in these teaching activities from 1946 until about 1948. He testified that he taught his classes, in substance, what he himself had been taught in the Party Training School in 1941, and based his instructions on the same textbooks.

Asked what he taught his pupils in New York County with reference to capitalism, imperialism, and its fate, Lautner testified:

"Well, capitalism as such reached its final stage of development, monopoly capitalism and imperialism, and turned into its opposite, what it was, in its progressive stages. That monopoly capitalism, imperialism, this final stage, carries within itself the very forces of its own destruction. These forces within monopoly capitalism that are bent to destroy monopoly capitalism and imperialism came forth, came about as the irreconcilable contradictions within capitalism itself. The next stage of development will come abruptly out of this monopoly capitalism, imperialism, and the role of the Communist Party was to create the necessity * * *

* * * * * *

"The role of the Communist Party was to create the necessary subjective conditions as part of this force within monopoly capitalism so that when certain objective conditions are given in this area, in this epoch, the irreconcilable contradictions with the monopoly capitalism reach a point where the state machine, the machinery, is in a crisis, it stops; the Communist Party, who created the subjective conditions, is in a position to challenge the system,

---

**6.** Notes of testimony, p. 788.

207 F.Supp.—3

**7.** Notes of testimony, p. 854.

monopoly capitalism, imperialism, and bring about its destruction, its downfall, through force and violence if necessary." [8]

The witness Donovan, then an employe of the National Recovery Administration and President of Lodge No. 91, the NRA Lodge of the American Federation of Government Employees, joined the Party in 1933. Donovan stated that he met the defendant at a Party meeting in Washington, D. C., in 1934. Defendant, according to the witness, was then a representative of the District Committee of the Party which included Washington. At this meeting, Donovan became a member of the Section Committee representing Party members who were employes of NRA.

This committee met weekly, always at a different location, and defendant was present at most of the meetings. Defendant was deferred to as the final authority in the group, and "the position taken by Dr. Blumberg was the position of the section committee." Donovan testified that at these meetings there were discussions of the necessity for Party education within the Section Committee and within the units under the Section Committee, "with particular emphasis on the fact that this was a section of Communist Party members in Washington, D. C., working in the Federal Government * * *." He described the type of educational work discussed:

"The reading, as a required assignment, of particular documents published by the Communist Party or one of its printing organizations; the assignment of particular individuals to prepare reports, summarizing or leading the discussion of the contents of a particular document; the receipt of orders from the various units for the Daily Worker or various current or classical items of Communist Party literature; the distribution by the Agit-Prop member of the section committee of such

literature after he had obtained it, to the representatives of the various units for transmission to the units." [9]

Donovan explained that by "classical" items he meant the standard past works of recognized Marxist and Communist authorities, such as Marx, Engels, Lenin and Stalin. The witness said that he participated in the distribution of this literature among Party members, and that some of the texts were discussed within the Section Committee.

The witness testified that V. I. Jerome, a Party theoretician, delivered a lecture at a meeting of the Section Committee in the course of which he stated that "Soviet Power was the basic slogan of the Communist Party." Donovan recalled another lecturer, Louis Weinstock, who spoke emphatically of the great interest of the Party in labor affairs.

Another witness, Lincoln J. Gerende, joined the Party in Baltimore in 1937, at defendant's invitation, and remained a member until 1940. He testified that he joined under the name of Carl Brenn at defendant's suggestion, "because of the fact that my wife, former wife, was a Government employe, he thought it would be advisable if I used a name other than my own."

In about 1938, Gerende, at the request of Fields, District Organizer, took a job with the CIO Steel Workers Union in the Bethlehem Steel Corporation, in Baltimore. Defendant was then City Organizer or City Secretary of the Baltimore City Communist Party. The Party unit within the Local numbered between 20 and 30 members, and defendant visited the unit on occasion.

After about 4 or 6 months, Gerende took employment at the Workers' Bookshop in Baltimore, which had been organized under Party auspices to sell and disseminate Party literature. Defendant and Fields visited the bookshop on occasion to find out what was being sold,

---

**8.** Notes of testimony, pp. 877, 878.

**9.** Notes of testimony, p. 53.

and to discuss with the witness the debt due the International Publishers, which was engaged in publishing Party literature. The bookshop carried for sale the works of Marx and Engels, Lenin and Stalin, "also pamphlets and books by various other members of the Communist Party, both of the United States and of the Soviet Union, China, as I recall, and France, and England." The bookshop also sold the "Daily Worker" and distributed it to the various units. The witness explained the function of the "Daily Worker":

> "Well, as I recall it, the Daily Worker was the official organ of the Communist Party of the United States of America, and as such on its editorial pages, at least, it stated the official policy of the Communist Party and also gave the interpretations of the news events in terms of this official policy." [10]

Gerende testified that the bookshop was under the general supervision of defendant and Fields, and was open to the public:

> "Well, the bookshop, of course, was an open sales place. Individuals who came in would be sold literature; that included not only Party members or those who may have been sympathizers but strangers would come in from time to time. It was my job to try to interest and sell them the literature that we had available for sale." [11]

The witness stated that he also aided defendant in teaching at the Workers' School, "a subsidiary of the local Communist Party," whose purpose was to provide education in Marxism-Leninism not only for Party members but for anybody who might be interested in taking these courses. In connection with this school, Sunday night forums were held in 1938 and 1939. Gerende testified that he endeavored to obtain speakers for these forums, and often did the speaking

himself. He said that defendant came to some of these forums, and spoke on at least one occasion.

Gerende testified that one of his functions was to take Party literature to various outlying Party units in Baltimore, and to urge its sale and dissemination. This literature included the Party classics as well as current documents and pamphlets. In connection with these visits to the Party units, Gerende participated in the "educationals" at meetings of the unit, which he defined as follows:

> "Well, the educational part of the meeting was a meeting that was devoted to the exposition by some member, or a discussion by all members, of problems which arose within the given period, that is current events, with the object of applying to those, the analysis of those events, Marxian principles. Sometimes they also involved primarily discussion of some one of the fundamental works of Marxism. It might be the 'Communist Manifesto,' it might be 'Problems of Leninism,' or 'Foundations of Leninism,' it might be the specific work of Lenin, such as 'State And Revolution.' " [12]

One piece of Party literature which was vigorously pushed was "The History of the Communist Party of the Soviet Union," which had been written and published with the approval of the Central Committee of the Communist Party of the Soviet Union. Gerende said, "we attempted to urge every single member of the Communist Party to read the work, for one thing, and study it very carefully; and, secondly, to attempt to influence all their friends to obtain a copy and to read it and to discuss it with them." [13]

In 1939, defendant became District Organizer of the Maryland-District of Columbia District of the Party, and Gerende, as Administrative Secretary of

10. Notes of testimony, p. 267.

11. Notes of testimony, p. 268.

12. Notes of testimony, p. 301.

13. Notes of testimony, p. 319.

the District, paid him his salary. In 1939 or 1940, at defendant's suggestion, Gerende became Organizer for the International Workers' Order, a fraternal insurance group connected with the Party.

Gerende testified to a meeting of local Party Leaders, in which defendant took an active part, to discuss the entirely new situation created by the Hitler-Stalin Pact of 1939. The witness testified to the result of this meeting:

"At the conclusion of the discussion it was determined to apply the Party policy, attempt to get out and explain it as widely as possible, as rapidly as possible, and to utilize Party literature as widely as possible to help to explain the position of the Soviet Union." [14]

The witness Hasenkamp joined the Party in Baltimore in 1942, as the result of a "visit" by the F. B. I. Hasenkamp was at that time employed by the Bethlehem Shipbuilding Co., and was a member of the Union. He testified that he first met the defendant when the latter came to his home in company with a fellow-worker of the witness, one Kaswah, a Party member. The purpose of the visit was to pass upon Hasenkamp's eligibility for Party membership.

Hasenkamp stated that he went to Party meetings, mostly at the Convoy Club in Baltimore every week—"sometimes two or three times a week"—for about three years. Defendant was then Chairman of the Maryland-District of Columbia District of the Party, and on occasion gave short talks or "speeches" at these meetings. Pamphlets were given out and the members were urged to subscribe for the Daily Worker. The witness explained the proceedings at these meetings:

"Well, there was a problem of always trying to get new members into the Party and to keep the dues up, which is a very hard matter; and those that dropped out, we would find ways and means to try to get them back, and give out literature wherever we could to anyone that might be, that we thought would read it, and to always cooperate in any way possible to take and push the cause along, any way at all to help the cause." [15]

At these meetings, defendant, among others, constantly stressed the importance of "having the unions go along and be guided by what we did down to these Communist meetings, to take and act as a kind of steering, to steer the union, to guide the union along the lines that they wanted it, the way they wanted to go, select certain people in certain offices and certain policies, and things such as that." Hasenkamp testified that there were pamphlets and books at every meeting, and the members were urged to read them and to give them out to others; that he read the Daily Worker and Sunday Worker completely.

Hasenkamp testified that at these Convoy Club meetings he learned of Marx and Lenin:

"I was encouraged to read all of their books and try to get a complete library on everything that they wrote, not only have it but to read it and study it and explain it to anybody else who would be willing to listen to it." [16]

To be a member of the Convoy Club, Hasenkamp stated, it was necessary to be a member both of the Party and of the Union Local. The witness attended the 1944 Convention of the Maryland-District of Columbia District, as an alternate delegate from the Convoy Club. The Convention was broken into two sessions, three to four weeks apart, and was held in Baltimore. Defendant opened the Convention and introduced the delegates, but only by the first name, e. g., "Mary from Aircraft," "Phil from Steel," etc. One Lannon, from New York, spoke at length of the necessity of studying the science of Marx and

---

14. Notes of testimony, p. 338.

15. Notes of testimony, p. 522.

16. Notes of testimony, p. 534.

Lenin and applying it to the members' daily, individual problems. He excoriated the non-Party Union members:

> " * * * there was a group of union men who were very viciously against the Communist Party and they would fight terribly for hours and hours at a time at the union meetings, and he devoted a lot of time to discussion to running them down and classifying them as 'Red baiters' and Nazis and all such names as that, those members of the local who didn't like the policy of the Communist boys, that group that they were pushing ahead." [17]

There was much discussion during the first session of the need for a new Party name, so that the Party "could function a lot better." Many names were suggested, but none was agreed upon. This first session of the District Convention chose delegates for the National Convention to be held in New York a week or so later. Defendant was one of the delegates.

The second session of the 1944 District Convention was held following the National Convention. A speaker announced that the Party from now on should be known as the "Communist Political Association." Hasenkamp testified that defendant, among others, "explained that the change of the name of the Party did not in any way change anything except it was changed only for legal purposes, and it was changed so they could intensify their efforts and operate more efficiently and that they could have openings in so many organizations and things that the doors were closed to them before. And the purpose was emphasized again to take and use the science of Marx and Lenin to intensify their efforts and take and advance the Party by every means that you could possibly utilize." [18] At about this time, defendant became Vice-President of the Communist Political Association of Maryland and the District of Columbia.

The witness MacLeod, then a student at the University of Alabama, first met defendant at a public meeting of the American Peace Mobilization in Baltimore, early in 1941. MacLeod again met defendant a few days later in the Maryland Bookshop, Baltimore, which had on display "numerous books, pamphlets, and tracts espousing the cause of Communism." After a desultory conversation, defendant invited the witness to lunch with him. During lunch, the conversation turned to Party affairs and Party aims and purposes. Speaking of defendant, MacLeod testified:

> "He then pointed out the fact that major social changes throughout history had not come about by peaceful means but had come about by bloodshed. He cited instances beginning, I definitely recall, with the American Revolution, the Paris Commune, the war in Spain, which had been a failure, where it was absolutely necessary to use force and expend blood in order to make major social changes." [19]

When MacLeod pointed out that certain social advances had been achieved in this country by peaceful means, defendant lost his temper:

> "Dr. Blumberg grew excited and angry with me and said that I had been misled in thinking that definite sweeping change could come about through any such slow processes. He said that the Party, referring to the Communist Party, needed and wanted young men, but needed and wanted people who had the courage of their convictions and were willing to fight for them." [20]

Defendant rejected MacLeod's program of "steady growth", and described

---

17. Notes of testimony, p. 554.
18. Notes of testimony, p. 564.

19. Notes of testimony, p. 1694.
20. Notes of testimony, p. 1695.

the witness as "more a pitiful Pink than a Red." According to MacLeod:

"He reiterated the fact that world history as even studied by a mediocre student was a pattern in which ultimate gain with any major change could only be accomplished through fighting.

"After several minutes more of conversation back and forth, which I do not at this time recall, he asked me point blank whether or not I would be willing in the cause that I espoused at that time, for the purposes of the Communist Party, to take a rifle and fight in the streets of Baltimore if need be.

"I answered him, no. On that note our luncheon ended somewhat abruptly.

"As we moved to the door to leave the lunch room Dr. Blumberg suggested that my thinking needed straightening out, and he said that I should visit a young Communist school or organization of some type where I might meet some people who could straighten it out for me." [21]

MacLeod did not see defendant thereafter until the time of trial.

Mrs. Swan, another witness, was a member of the Party from 1939 to 1946. She testified that she first met the defendant in Washington, D. C., in 1944, when she was the legislative representative for the National Negro Congress in Washington. She described the circumstances of the meeting as follows:

"Well, it was arranged for me with the organizer for the Washington-Baltimore area that I should meet Dr. Blumberg, which I did at a cafeteria down on a side street opposite the House of Representatives, and we had our first conference there, and formal meeting, and also, you might say, a welcoming me into the group, the Communist Party group, that was functioning in Washington, D. C., under his leadership." [22]

The witness explained that the "group" consisted of "legislative representatives of organizations who were also members of the Communist Party." She stated that this group met regularly every other week, and that "Dr. Blumberg was the head of our group; he was the leader, he was the one who directed our activities and also directed our educational (sic) along the lines of the Communist Party doctrines." Many of the Party classics were used as texts at these meetings, including "State and Revolution," by V. I. Lenin, and "The History of the Communist Party of the Soviet Union."

Mrs. Swan described in some detail the procedure at these meetings:

"Meetings were called of the members of the Communist Party group acting as legislative representatives of organizations in Washington, and many times there would be someone assigned to give a report. However, I recall that after every report given by any individual member of that Communist Party cell Dr. Blumberg would then take over full discussion for clarification, for also impressing upon the members of the group exactly what the interpretation should be of the specific assignment that had been given. He acted really in each instance as our teacher and gave us to understand in the educational that this material we must not only read but study and understand in order that we may become strong Bolsheviks.

"All of these pieces of literature that are here were used at one meeting or another to bring out points that a revolutionist shown (sic) know, should understand, should become completely imbued with in order to carry through the Communist Party's revolutionary aims." [23]

21. Notes of testimony, p. 1696.

22. Notes of testimony, p. 1055.

23. Notes of testimony, p. 1064.

The witness stated that as long as she was in Washington and affiliated with the Party, she attended those meetings "with Dr. Blumberg." Asked for the sum and substance of what she was taught at these meetings under defendant's direction, Mrs. Swan testified:

"Well, first of all, I was taught that I must be a disciplined Communist and follow whatever directives are given by any constituted body or person, leader, in the Communist Party. I was taught further than that that being a disciplined person, therefore, the 'Strategy and Tactics,' the history of the mistakes and the, might I say, good things that had happened as far as the U. S. S. R. is concerned were to be a part of my learning.

"I was taught that capitalism is on its way out, that capitalism is practically dead; that we as Communists must be ready to dedicate ourselves to the revolution, to the violent and complete overthrow of the capitalist government as constituted here in the United States; that everything we did from day to day was only a part of the final goal of overthrowing the capitalistic country, United States of America; that the two could not live in one country together, capitalism and those who were striving for socialism, and at the slightest break we would have to bring our forces against the capitalist forced in a revolution and revolt and take over, and we would then establish here in America the dictatorship of the proletariat, and from that we would go on to socialism. There was no way that we could give in, there was no peaceful means of this being accomplished, and that was brought out in our readings and our teachings and the many, many lectures given to us in our Communist Party meetings." [24]

Mrs. Markward, another witness, joined the Party in Washington, D. C., in 1943, at the suggestion of the F. B. I., and remained active therein until late in 1949. In that period, she held many offices in the lower echelons of the Party, and for a time served as a paid full-time functionary. At the time she joined the Party, she stated, defendant was Chairman of District No. 4, which comprised Maryland and the District of Columbia.

The witness attended both sessions of the 1944 District Convention, in Baltimore. She recalled that defendant was the Chairman of the first session, at which the proposed change in the Party name was discussed. Lannon, Executive Secretary of District No. 4, spoke in favor of the change:

"The substance of what he had to say was that at that time the United States and the Soviet Union were allies, were cooperating in the defeat of Fascism and Japan, Italy and Germany; it was very necessary for everyone in America to get behind the war effort, and Communists wanted to show their goodwill by, and should show their goodwill by removing any obstacle which would make them a disruptive force in the national united front; that, therefore, by not being a political party but being an association of like-minded people they would remove any dissension in the political scene. He said, however, that the Communists were not giving up the ultimate goal of socialism; that we must remember, they were only postponing that struggle." [25]

Between the two sessions of the District Convention, Mrs. Markward attended the 1944 National Convention in New York City, at which defendant was also present. She testified to the change in the Party name to the Communist Political Association.

The witness recalled that defendant attended the second session of the 1944

24. Notes of testimony, p. 1067.

25. Notes of testimony, p. 1112.

District Convention, and that he was elected Vice-President of District No. 4, Communist Political Association. The Convention approved the change of the Party name. Mrs. Markward estimated that during the time she was a Party member, she was present at a minimum of 35 to 40 official functions which defendant attended in some official capacity, including District Committee meetings, District Board meetings and District and National Conventions.

Mrs. Markward testified in some detail regarding District Committee meetings and District Conventions, in the summer of 1945, at which the defendant, and others spoke on a resolution of the National Board of the Communist Political Association, dealing with the reconstitution of the organization as the Communist Party of the United States of America. The substance of these speeches was that the Party had erred grievously in ever believing that the change to a Communist society could be achieved through peaceful, democratic means, and that it must return to the principles of Marxism-Leninism. The resolution was approved at the first session of the 1945 District Convention. At the second session of this Convention, defendant was elected to the District Committee. Shortly thereafter, he was named Acting Chairman of the Communist Party of Maryland-Washington, D. C.

In the latter part of 1945, the witness stated, the District Committee voted that all the literature which had been so widely circulated during the revisionist period—which was aimed solely at advancing the revisionist Browder line— should be removed from the clubs, and that attempts should be made to have the individual comrades destroy such literature as they had in their possession. "They at the same time, of course, discussed and said that it would be necessary to be sure that the Marxist-Leninist literature was put in the hands of these people to reeducate them along that line."

Somewhere in this period, defendant was appointed to the Educational Commission and also to the Political Action Commission of the Party.

Mrs. Markward testified concerning a District Committee meeting at which defendant made a "many-pronged" address. Defendant spoke of the necessity to speed up the reorganization, to get the clubs organized, "so that they could move at the direction of the leadership any time it was necessary for them to take action;" of the necessity of speed in the re-registration of all of the persons who had been members of the Communist Political Association; of the necessity to bring up the dues payments, and to speed up the sale of the Daily Worker and other Party periodicals. Defendant also spoke of the necessity for concentration of workers in the basic industries:

"He discussed the necessity for the concentration due to the fact that it was important for the Party to gain power and control in these basic industries; that it was necessary to have the goodwill of the persons who were working, the non-Communist persons who were working in the industries, for them to be influenced, to believe that the Communists and the Communist Party line was right. And that was the reason he gave the necessity for all of these other actions.

"The reason that you had to have all these people believing that all this was all right, he went further to state, was the fact that if the Communist Party ever was to take the vanguard, and the workers of America to have a proletarian revolution, that it would be necessary to have control of the key industries."[26]

At a District Board meeting in October, 1946, the witness said, defendant emphasized that "in order to maintain a united Communist Party that we must practice democratic centralism at all times * * *."

26. Notes of testimony, p. 1152.

Mrs. Markward testified that she last saw defendant at a meeting of the District Committee in December, 1948. Jack Kling, Treasurer of the Communist Party, U. S. A., spoke on the national Party policy of "concentrating in basic industries."

The witness testified that in the course of her membership in the Party, she received some "Party education." In 1943, she attended classes in Washington, D. C., conducted by Emanuel Levine, "who was sort of a Party troubleshooter out of the national office." In 1944, she took a one-week course at the Jefferson School, New York, in the "Science of Philosophy." In 1948, she attended a series of classes in Washington, D. C., on "Nationalism." Early in 1949, she attended a series of classes "on the ABC's of Marxism-Leninism," under various teachers, including Charles Payne. The instruction was based on the Communist classics. The witness testified with respect to Payne's teaching:

"The class which remains in my mind is one taught by Charles Payne. He told us that the Communist Party must necessarily bear the burden of taking the vanguard role in leading the people of America through a revolution. He told us that this revolution could not be done peacefully; that the capitalist element in the country would not just hand over the reins to the Communists but that the machinery of government would have to be seized by the dictatorship of the proletariat and then converted to the form of government which such a dictatorship would use.

"He said that after the dictatorship of the proletariat would be organized no other political party could be allowed in the United States; that any other political party would be an enemy of the people and would have to, by force, be suppressed." [27]

Mrs. Markward further testified that, as a security measure, Party members of the Maryland-District of Columbia District, during 1948 or 1949, met as the "Interracial Cultural Association."

There was abundant testimony of Party activity in the "Lehigh Valley Section," which was part of the District of Eastern Pennsylvania and Delaware, of the Communist Party.

The witness Thomas, who lived in Allentown, Pennsylvania, was a member of the Party from 1937 to 1939, and rejoined it in 1944 at the request of the F. B. I. He was last active in the Party in May, 1954. He testified that he first met defendant at the home of a Dr. Brooks in Kitnersville, Bucks County, Pa., in December, 1952. The occasion was a meeting of the Section leadership of Lehigh Valley, and defendant was introduced to the witness as "Paul". At this meeting, the discussion concerned a "Guide and Handbook for steel" that was to be issued by the Party. The suggestion was made that "we contact steel workers to find out what their grievances are," to aid in the preparation of the book.

Thomas testified that he met "Paul" again in Allentown, Pa., in February, 1953, and that they proceeded, with others, to the home of one Kinces, in Doylestown, Pa., for a meeting of the Section Committee. One Harry Walter, who was employed by the Bethlehem Steel Company, "gave a report on steel and the prospects of doing work within steel."

The witness stated that he participated in classes held in his own home in 1952, in which the "History of the Communist Party of the Soviet Union" was used. He also attended classes in Allentown, Pa., in 1953, in which they discussed the first chapter of "Foundations of Leninism." He said, in addition, that a portion of the regular "club or branch" meetings was devoted to education in the basic Marxist-Leninist classics, and that they read and discussed current Party literature. As Literature Director for the entire Lehigh Valley Section, Thomas distributed Party literature

27. Notes of testimony, p. 1176.

throughout the Section. One item so distributed was "How to be a Good Communist," which was used as a basis of instruction in his own club, the Allentown City Club.

In the classes which he attended in 1952 and 1953, the students were taught the role of the Communist Party in bringing about a change in the government of this Country:

> "We were instructed that the Communist Party was the leader of the proletariat in this country, and that only by a proletarian revolution could we establish a dictatorship of the proletariat in the United States." [28]

Asked if he received any instruction in these classes regarding the application of the events of the social revolution in Russia to time and conditions here, Thomas testified:

> "A Jack, who was the section organizer of the Communist Party in 1953, said that conditions weren't exactly ripe for the proletarian revolution in this country; that the workers had not been educated enough.
>
> "Q What did he say about educating the workers?
>
> \* \* \* \* \* \*
>
> "THE WITNESS: He said that we must infiltrate into basic industry, such as steel, automotive, transportation, and at such a time when the majority of the working classes organize, why, conditions would then be ripe." [29]

The witness Walter, who lived at Kitnersville, Bucks County, Pa., at the time of trial, joined the Party in 1946. He was then an employe of the Bethlehem Steel Co., and a member of Local 2599, United Steel Workers of America. He testified that he began to furnish information to the F. B. I. in 1952, and that he continued to be a Party member until he appeared as a witness in this case.

Walter stated that he first met defendant at a "photographer's place" in Philadelphia, in January, 1953. Defendant was introduced to him only as "Doc". The occasion was a meeting of the "Steel Commission" of the Eastern Pennsylvania-Delaware District. The witness explained that the Steel Commission was a Party organization that "gathers information from all different steel companies throughout the United States." The meeting, he said, was held in the attic, and the photographer "drove around the block to make sure that everything was safe and nobody was watching the place."

The meeting was concerned largely with the preparation of a "Steel Guide and Handbook." In the witness' words:

> "Well, there was a Steel Guide and Handbook that they said was a deadline and we should get our information in, and this was information collected from different steel companies throughout the United States on grievances, conditions in shops, and so forth, and practically the whole day was discussed on steel." [30]

At this meeting, Party members of the "Steel Commission" reported on labor conditions in the plants where they were employed, and Walter "made a report from Bethlehem Steel." Defendant questioned Walter concerning grievances and conditions generally in his shop.

Walter next saw the defendant at the meeting of the Section Committee at Kinces' home in Doylestown, in February, 1953. At this meeting, defendant made a report "on the Rosenbergs":

> "He said that we should send telegrams to the President and, you know, for clemency for the Rosenbergs, and that the Pope was going to bat, you know, for the Rosenbergs at that time. He said we

---

28. Notes of testimony, p. 1492.

29. Notes of testimony, p. 1494.

30. Notes of testimony, p. 1519.

should take lessons and admire them, you know, for keeping quiet the way they were." [31]

The witness, at this meeting, made a report on steel based on a questionnaire:

"I made a report on the amount of men in the locals and the amount of steel that is produced, the grievances, and the different gripes of all the workers, and the speedups, nationality groups, you know, the concentration of nationality groups in the departments, and so forth." [32]

Defendant attended an all-day "steel club" meeting of the Communist Party of Lehigh Valley at Walter's home, on April 18, 1953. Those present took turns reading aloud from "Joseph Stalin, A Political Biography," and after each reading attempting to explain the passage. The whole day was spent "going over" the book and discussing its meaning. Defendant took his turn reading, and said that "we should use the same tactics and procedure as the Communist Party of the Soviet Union." The witness recalled one particular part of the book:

"A There is one part in there where it says about we should have a closely knit organization, tightly woven organization, in this country, well disciplined organization, and we should become a fortress, and all those that are, you know, pass the test, you know * * *

* * * * * *

"THE WITNESS: In another place there where he says we only need three things, that is 'guns, guns, and more guns.' " [33]

Walter testified that he met defendant again the very next day at the photographer's place in Philadelphia. The occasion was "a National Steel Commission meeting of the Communist Party of the Eastern United States." There were reports concerning conditions at the various steel plants. Defendant, referred to as "Doc," also spoke:

"There was—Jack made a report on the clubs, the amount of men we had in steel, Comrades we had in steel. He said we had five in Bethlehem and one in fabricating, and Doc says that he has a member at United States Steel now, in Morrisville, and this was like a wedge, you know it, was a starting point, you know, to start the activities at Morrisville." [34]

There was some discussion at this meeting on the general subject of peace. According to Walter, defendant said "that President Eisenhower wasn't sincere in his peace proposals and that Russia was." The meeting lasted all day. Walter testified that defendant proposed "that we have educational classes" in Communist Activities.

Walter testified that educational classes were held at his home during two days in July, 1953. Defendant was not present. Among the textbooks used was "The History of the Communist Party of the Soviet Union." The same procedure was followed as in former classes. Those present took turns reading and after each reading there was a general discussion of the text.

■■ Considering all the evidence in the light most favorable to the Government, Noto, supra, 367 U.S. at p. 296, 81 S.Ct. 1517, we conclude that it sufficed to make a case for the jury on the issue of illegal Party advocacy. We think the jury could permissibly infer that such teaching and advocacy as the evidence establishes, "was aimed at building up a seditious group and maintaining it in readiness for action at a propitious time. * * * the kind of indoctrination preparatory to action which was condemned in Dennis." Yates, supra, 354 U.S. at pp. 321–322, 77 S.Ct. at p. 1078. The jury could properly conclude, we think that the Party engaged

---

31. Notes of testimony, p. 1527.

32. Notes of testimony, p. 1531.

33. Notes of testimony, p. 1544.

34. Notes of testimony, p. 1549.

**44**

in the advocacy "not of * * * mere abstract doctrine of forcible overthrow, but of action to that end, by the use of language reasonably and ordinarily calculated to incite persons to * * * action," immediately or in the future. Id., at p. 316, 77 S.Ct. 1064.

The testimony of MacLeod and others of their dealings with defendant is of particular significance. As the Court said of comparable testimony in Scales, supra, 367 U.S. at p. 243, 81 S.Ct. at p. 1493:

> "We regard this testimony * * * as being of special importance in two ways: it supplies some of the strongest and most unequivocal evidence against the Party based on the statements and activities of a man whose words and deeds, by virtue of his high Party position, carry special weight in determining the character of the Party from the standpoint of the Smith Act; and it appears clearly dispositive as to the quality of petitioner's Party membership, and his knowledge and intent, when we come to consider him not as a Party official but as the defendant in this case."

█ The remaining question on this phase of the case is whether such advocacy was sufficiently broadly based to permit its attribution to the Party. We conclude it was. The advocacy of action was not "sporadic," the instances of it being neither infrequent, remote in time nor casual.[35] We cannot say that the jury could not have found that the criminal advocacy was fully authorized and condoned by the Party. Paraphrasing the language in Scales, supra, at p. 254, 81 S.Ct. 1469, we regard the testimony of the witnesses, whose credibility, of course, is not for us, as indicating a sufficiently systematic and substantial course of utterances and conduct on the

part of those high in the councils of the Party, including the defendant himself, to entitle the jury to infer that such activities reflected tenets of the Party. The testimony described activities in various States, as well as the District of Columbia, including the teaching at several schools, among them the National Party School. The witnesses recounted advocacy by high Party officials, some of them leaders of the Party, in several states and in the District of Columbia. Therein, the case is distinguished from Noto where the evidence of illegal advocacy "was limited almost exclusively to Party doings in western New York, more especially in the cities of Rochester and Buffalo, the scene of petitioner's principal Party activities." Noto, 367 U.S. at pp. 291–292, 81 S.Ct. at p. 1518. While the advocacy here is not so broadly based as in Scales, we do not understand that there is any talismanic number of jurisdictions required in order to impute responsibility to the Party. Further, there was testimony that the Party followed the principle of "democratic centralism" whereby a position once adopted by the Party must be given unquestioned adherence by the whole membership. The conformity of the views expressed and the terms employed in advocating violent overthrow in the different states could reasonably be taken by the jury as a practical manifestation of democratic centralism. All of these factors combine to justify the inference that the illegal individual advocacy as to which testimony was adduced was in truth the expression of Party policy and purpose.

█ The sufficiency of the evidence as to the remaining elements of the crime requires no exposition. Defendant's "active" membership in the Party is beyond dispute. Indeed, defendant stipulated of record that he had held high office in the Party, without specify-

35. In Scales, supra, at p. 253, footnote 28, 81 S.Ct. 1498, it was said:
  "Although most of the particularized evidence related to events not within the limitations period, it was of course open to the jury, under proper instructions which were given, to infer that such events reflected the character of Party advocacy during the limitations period."

ing the precise quality of his membership in so many words. The elements of defendant's "knowledge" and "specific intent" require no further discussion of the evidence beyond that already given as to his utterances and activities.

Since, in our view, the evidence was amply sufficient to sustain the verdict, defendant's motion for judgment of acquittal must be denied.

We need consider but one of the issues raised by defendant in support of his motion for a new trial, since the clarification of the law with relation thereto after this defendant's trial requires the grant of defendant's motion.

 The witness Walter kept the F. B. I. posted as to the proceedings at Party meetings, and as to Party affairs generally. Walter testified that he "would meet the agent the day after the meeting" and make an oral report on what had transpired, and that the agent would make written notes as he talked. Defendant served a subpoena, in proper form, requiring the production, inter alia, of all notations of oral reports made by Walter. Defendant had shown no inconsistency between these reports and the witness' testimony. Following our interpretation of Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), we sustained the Government's motion to quash the subpoena. It later developed that our reliance on Gordon was misplaced, as was that of both the trial Court and the Court of Appeals in the first Scales trial. See, Scales v. United States, 227 F.2d 581, 592 (4th Cir.1955), rev'd 355 U.S. 1, 78 S.Ct. 9, 2 L.Ed.2d 19 (1957), citing Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Jencks, which was decided a year after this defendant's trial, distinguished Gordon, and held that a defendant is not required to lay a preliminary foundation of inconsistency, where a sufficient foundation is established by the testimony of the witness that his reports were of the events and activities related in his testimony.

It is clear, therefore, that we erred in our ruling with respect to the reports of the witness Walter and that a new trial must be granted. It is unnecessary to consider our action in regard to reports of the witnesses Thomas and Markward. Accordingly, we enter the following:

### ORDER

NOW, June 29, 1962, it is ordered and decreed that:

1. Defendant's motion for judgment of acquittal be, and it is, denied.

2. Defendant's motion for a new trial be, and it is, granted.