762 F.Supp. 1082 (1991)
Herman Benjamin FERGUSON, Plaintiff,
v.
FEDERAL BUREAU OF INVESTIGATION, Defendant.
No. 89 Civ. 5071 (RPP).
United States District Court, S.D. New York.
April 22, 1991.
*1083 *1084 *1085 Center for Constitutional Rights by Joan P. Gibbs, New York City, for plaintiff.
Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Steven I. Froot, Asst. U.S. Atty., New York City, for defendant.

OPINION AND ORDER
ROBERT P. PATTERSON, Jr., District Judge.
Plaintiff Herman Ferguson ("Ferguson") moves to compel defendant Federal Bureau of Investigation ("FBI") to reprocess and eliminate redactions in his 1980 and 1989 requests for documents or, in the alternative, to prepare a second, more detailed index of material it claims is exempt from disclosure, under the Freedom of Information Act ("FOIA"). 5 U.S.C. § 552 et seq. The FBI moves for partial summary judgment pursuant to Fed.R.Civ.P. 56 and plaintiff cross moved pursuant to Fed.R.Civ.P. 56(f) for an order continuing or denying defendant's motion for summary judgment and directing defendant to submit to discovery.[1]
By Order and Opinion dated December 18, 1990, 752 F.Supp. 634, the Court reserved decision on defendant's motion for partial summary judgment and on plaintiff's motions for discovery and to compel reprocessing of the document requests, pending in camera review of specified relevant documents, which were provided by the FBI in accordance with a list submitted by plaintiff as being redacted documents potentially of the most interest, together with an in camera affidavit of Joseph Smith providing a sample analysis of one document (31). In Camera Declaration of Joseph P. Smith, December 27, 1990 ("in camera Smith Declaration"). That review has been conducted. As a result, the Court denies defendant's motion for partial summary judgment.
The exemptions cited as supporting the redactions were too broadly applied to the documents without sufficient justification. Accordingly, there exist issues of fact as to whether defendant has adequately searched for and produced documents responsive to plaintiff's request, releasing reasonably segregable portions in accordance with the statute. Plaintiff's motions for another Vaughn index and to compel discovery are denied without prejudice to renewal after compliance with this decision has been completed. The Court orders the defendant to reprocess its document production and release without redactions the portions specified below and to produce, for in camera review, entirely unredacted copies of all its files produced to date. The Court suggests that because almost 23 years have elapsed since the plaintiff's conviction and because of the desirability of reducing public speculation about the conduct of the FBI in the 1960's, the Attorney General should consider whether the policy of waiving legal exemptions for withholding historic investigatory records over 15 years old, H.R.Conf.Rep. No. 93-1380, 93rd Cong., 2d Sess. (1974), 1974 U.S.Code Cong. & Admin.News p. 6267, reprinted in 120 Cong.Rec. 32597, 32600 (daily ed. September 25, 1974) (Conference Report on the Freedom of Information Act amendments), should not be applied to this FOIA request.

*1086 BACKGROUND
Plaintiff Ferguson was an educator and a leader in Black Nationalist politics in New York in the 1960's. In June of 1967, he and several acquaintances were arrested on various criminal charges related to their involvement with groups called the Revolutionary Action Movement ("RAM"), the Black Brotherhood Improvement Association ("BBIA") and the Jamaica Rifle and Pistol Club ("JRPC"). In the summer of 1968, Ferguson was convicted in New York Supreme Court, Queens County, with co-defendant Arthur Harris, of conspiracy to murder two other black leaders: Whitney M. Young, Jr. of the National Urban League ("Urban League") and Roy Wilkins of the National Association for the Advancement of Colored People ("NAACP"). Ferguson was sentenced to a prison term of 3½ to 7 years. He was released on bond pending appeal. After hearing that his last appeal had been denied, Ferguson fled the country and lived as a fugitive for almost two decades. While a fugitive, Ferguson made an FOIA request in August 1980 for documents located at FBI headquarters which related to him; some documents were delivered in redacted form to plaintiff's attorney in January 1984. In 1989, Ferguson returned to New York and was arrested. He made another FOIA request in April 1989, seeking documents from files at FBI headquarters and the New York and Philadelphia field offices of the FBI. This action, which sought expedited processing of the files in view of the criminal proceeding against Ferguson, was commenced on July 26, 1989. On October 24, 1989, this Court ordered expedited processing of documents for the period 1963-70, within 85 days, and Vaughn indices for that period within 32 days thereafter. On January 31, 1990, the Court made a further order requiring a Vaughn index for the latter period. In June, 1990, Ferguson pleaded guilty in state court to jumping bail and was sentenced to one year in prison which he is serving concurrently with the original sentence on the conspiracy to murder charge.
Ferguson asserts that he was framed in the 1967-68 prosecution and that the FBI has in its possession either exculpatory material or material which would lead to exculpatory evidence. He alleges that during the 1968 trial and the subsequent appeals he was wrongfully deprived of the statements of witnesses against him, exculpatory evidence, and the names of informants against him, citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) and People v. Rosario, 9 N.Y.2d 286, 213 N.Y. S.2d 448, 173 N.E.2d 881 (N.Y.1961). The major witness against Ferguson and his co-defendant, Arthur Harris, at the 1968 trial was Edward Lee Howlette, an undercover New York City policeman attached to the New York City Police Department's Bureau of Special Services ("BOSS"), who infiltrated the group led by Ferguson and testified extensively about the conspiracy for which Ferguson and Harris were convicted.[2]
In response to Ferguson's FOIA request, the FBI has searched for records by reviewing its general indices for cards bearing the name "Herman Benjamin Ferguson" (plaintiff's full name) and variations thereof. The search of FBI headquarters files located three main files and twenty four cross-references indexed to his name. Declaration of Regina M. Superneau, February 16, 1990 ("Superneau Declaration"), ¶¶ 13-14. The three main files are classified *1087 under numbers 88, 100 and 157. Classification 88 concerns fugitive investigations; classification 100 is described as "Internal Security" or "Security Matters"; classification 157 is described as "Civil Unrest", often paired, as is Ferguson's file, with a sub-caption of "Racial Matters." Id, ¶¶ 15-17. The cross-references include eleven "serials" from the FBI Headquarters "COINTELPRO" file[3] and fall into six investigative classifications: 88, 100, 157 (described above); 32  "Identification"; 62  "Miscellaneous," which consists of documents related to a general investigation of "Black Extremists-Racial Matters"; and 105  "Internal Security or Security Matter." Superneau Declaration, ¶ 18.
Defendant seeks partial summary judgment with respect to the 1980 FOIA request and the 1989 FOIA request as to documents through 1970 on the ground that it has reasonably and adequately searched for and produced all the documents to which the plaintiff is entitled under FOIA in properly redacted form, taking into account the statutory exemptions from disclosure. Ferguson opposes the motion and seeks reprocessing or a more detailed Vaughn index. Plaintiff also cross moves for a court order denying summary judgment and directing the FBI to submit to discovery, arguing that his ability to oppose summary judgment is hampered by his inability to get information from the FBI. Fed.R.Civ.P. 56(f).
At the Court's direction, following oral argument, Ferguson's counsel submitted a list of 89 documents considered potentially most relevant to his claims, on October 16, 1990. On December 18, 1990 the Court ordered production of, and the FBI shortly thereafter produced, the 89 unredacted documents for the Court's in camera review, together with the redacted documents, each containing the number of each exemption applied by the FBI for redaction prior to release of the documents to plaintiff.[4]

DISCUSSION
To grant a motion for summary judgment a court must find that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law because, after sufficient time for discovery, the non-moving party has not made a sufficient showing of an essential element of its case as to which it has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if the evidence offered demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and the Court must view the facts in the light most favorable to the non-moving party. Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).
To compel discovery or reprocessing of a FOIA request, the Court must find that the FBI has failed to comply with its statutory mandate. Under FOIA, an agency seeking to withhold information in its files must show that it is entitled to withhold it under the specific exemptions listed in the statute, 5 U.S.C. § 552(b)(2)-(9), which are meant to prevent specific harms from the release of certain records. The *1088 burden is on the agency to justify nondisclosure and the exemptions must be interpreted to give effect to the strong Congressional intent of favoring disclosure under FOIA. The exemptions from disclosure must be narrowly construed. John Doe Agency v. John Doe Corp., 493 U.S. 146, 110 S.Ct. 471, 475, 107 L.Ed.2d 462 (1989); FBI v. Abramson, 456 U.S. 615, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982). See also, Donovan v. FBI, 806 F.2d 55, 58 (2d Cir. 1986).

I. The applicability of 552(b)(7)
The most numerous of the exemptions claimed by the FBI are sub-categories of the (b)(7) statutory exemption which refers to investigatory records "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). In the documents produced for in camera review, the redactions are almost entirely claimed under (b)(7); the only other exemptions asserted in these 89 documents fall under (b)(2), which covers material such as internal FBI symbols. Accordingly, the Court has reviewed only assertions of (b)(7) exemptions in determining whether the FBI is entitled to partial summary judgment. That portion of the statute provides that such records are exempt from disclosure,
but only to the extent that the production of such records (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority [sic] in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;
* * * * * *
Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.
5 U.S.C. 552(b)(7) et seq.[5] For exemptions under (b)(7) to apply, the records must have been compiled "for law enforcement purposes" and one of the specific exemptions under (b)(7) must also apply. Abramson, *1089 supra, 456 U.S. at 632, 102 S.Ct. at 2064. Subdivision (a)(4)(B) of 5 U.S.C. § 552 provides:
On complaint, the district court of the United States ... has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action.
5 U.S.C. § 552(a)(4)(B). Subdivision (d) of 5 U.S.C. § 552 provides:
This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.
5 U.S.C. § 552(d). The Supreme Court has repeatedly recited the purpose and principles of FOIA, which require "full disclosure unless information is exempted under clearly delineated statutory language." John Doe Agency, supra, 110 S.Ct. at 475 (quoting Dep't of Air Force v. Rose, 425 U.S. 352, 360-61, 96 S.Ct. 1592, 1598-99, 48 L.Ed.2d 11 (1976)).
The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the government accountable to the governed.
110 S.Ct. at 475 (quoting NLRB v. Robbins, 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978)).

1. Law Enforcement Purposes

The Supreme Court has interpreted exemption 552(b)(7), so heavily relied on by defendant, as follows: "Once it is established that information was compiled pursuant to a legitimate law enforcement investigation and that disclosure of such information would lead to one of the listed harms, the information is exempt." Abramson, 456 U.S. at 632, 102 S.Ct. at 2065.[6] Judge Weinfeld articulated the test for an investigation's legitimate law enforcement purpose as follows: "The appropriate test is whether the records indicate that the agency was gathering information with the good faith belief that the subject may violate or has violated federal law, or was merely monitoring the subject for purposes unrelated to enforcement of federal law." Lamont v. Dep't of Justice, 475 F.Supp. 761, 773 (S.D.N.Y.1979) (denying summary judgment as to records compiled under alleged authority of Smith Act and Subversive Activities Control Act). See also, Doherty v. United States Dep't of Justice, 775 F.2d 49, 52 n. 5 (2d Cir.1985) (citing Lamont and applying threshhold law enforcement purpose test of whether FBI "could reasonably have concluded that [subject of investigation] constituted threat to national security").[7]
In asserting that the underlying investigations of the plaintiff (before his flight abroad) were for law enforcement purposes and involved a criminal investigation or a lawful national security intelligence investigation, defendant cites 18 U.S.C. § 231, enacted in 1968, 18 U.S.C. § 2101, enacted in 1968, 18 U.S.C. §§ 2383-85 (the Smith Act, codified in 1948 but based on the earlier sedition statutes), and 50 U.S.C. § 781 et seq. (the Internal Security Act of 1950 and the Subversive Activities Control Act of 1950, enacted in 1950 and amended in 1954 *1090 and 1968.[8] The first two statutes are not relevant to most of the documents at issue here, since they were enacted after Ferguson's indictment in state court for conspiracy to murder and after much of the information in this first production was gathered.[9]
Defendant states with regard to its files classified under "88" that "[t]he legal authority under which the FBI conducted its fugitive investigation of plaintiff can be found in Title 18, U.S.C., Section 1703." Superneau Declaration, ¶ 15. Defendant's Memorandum of Law clarifes that the statute cited should have been 18 U.S.C. § 1073, which makes it a crime to travel in interstate or foreign commerce to avoid prosecution, or custody or confinement after conviction. As to files classified under "100", defendant states that "[t]he legal authority for the investigation of Domestic/Internal Security matters can be found in the Internal Security Act of 1950, Title 50, U.S.C., Section 781, et seq.."[10]Id., ¶ 16. This language, unlike the FBI's statement relating to classification 88, only indicates general authority to investigate such matters but does not state that the FBI ever relied on this statute for authority to investigate this plaintiff. With reference to "157" files, there is the same deficiency in the language citing 18 U.S.C. § 231, enacted in 1968, and 18 U.S.C. § 2101, also enacted in 1968, with 18 U.S.C. §§ 2383-85 (the Smith Act, also at issue in Lamont, supra).

A. The 1965 Investigation and the Law Enforcement Purpose Test
The reasons given by defendant at the time an investigation of plaintiff was opened are most pertinent in determining whether there was a legitimate law enforcement purpose and thus whether the application of exemption (b)(7) is warranted.[11] Exhibit 13 to the Declaration of Joan Gibbs, dated May 4, 1990, is a copy of an official FBI document dated January 1, 1965 and captioned "Subject: Herman B. Ferguson" which states: "This case was opened in view of the fact that the subject has some official position in the Organization of Afro-American Unity (OAAU)." Declaration of Joan S. Gibbs, May 4, 1990, Exhibit 13. The final sentence of the document states: "Since the subject does hold a position with the NYC Board of Education, Bureau permission is requested to continue the investigation in view of FERGUSON'S official affiliation with the OAAU." Id.[12] The FBI affirms that the 1965 investigation of Ferguson was opened because of his affiliation with the OAAU, "which the FBI had reason to believe was a militant organization." Supplemental Declaration of Regina Superneau, June 6, 1990 ("Supp. Superneau Declaration"), attached *1091 to Defendant's Notice of Motion for Partial Summary Judgment, ¶ 11. A "militant organization" may or may not mean that an organization could reasonably have been believed to be in violation of the Smith Act or the Internal Security Act in 1965. See Lamont, supra, 475 F.Supp. at 774. The FBI gives no other reason for having initiated this investigation or compiled these records and states that the 1965 investigation was later closed.
The FBI's contemporaneous characterization of the OAAU, attached as an appendix to Document 2, describes the OAAU as a group whose aim was "to eliminate differences between Negroes so they can work together for `human rights,' while the initial objective is to `internationalize' the American civil rights movement by taking it to the United Nations.... The OAAU will sponsor a program for Negroes of Education, politics, culture, economics, and social reform." The same document notes that Malcolm X, founder of the OAAU (and of other organizations), "condemned the non-violent civil rights movement and claims that Negroes should be taught to protect themselves, when and if necessary." (The document was written after the assassination of Malcolm X). Nothing in this contemporaneous characterization indicates that the FBI's initial surveillance of Ferguson, premised on his affiliation with the OAAU, an organization which the FBI itself described, at the time the investigation was opened, as dedicated to activities consisting of lawful political discourse, was connected to a reasonable conclusion that he had violated or might violate federal law or was a threat to the community. See Lamont, supra, at 774-75.[13] The plain statement contained in the Supp. Superneau Declaration, made twenty-five or more years after surveillance began, that the FBI "had reason to believe [the OAAU] was a militant organization," if that is meant to imply lawlessness, is merely conclusory. It does not identify the statute which it was believed plaintiff or the OAAU did or might violate and does not state what reason, if any, the FBI had in 1963-65 to suspect plaintiff or the OAAU of past or imminent violations of that statute or other federal law.[14]
Together with the statements of purpose in Exhibit 13 to the Gibbs Declaration, the headings and file numbers create a serious question whether 1963-65 records classified under 100 or "Security Matters" pertain to an investigation of Ferguson which was commenced or continued for law enforcement purposes, or whether they were so classified because the investigative records were compiled for the purpose of monitoring Ferguson solely because of his political affiliations and activities. See Lamont, supra, at 771-73, 774-75. These doubts are reinforced by the vague and conclusory assertions of the FBI in the instant action, as to the purpose of the *1092 "100" investigatory records and as to investigatory records of this period which fall under the 157 classification in the main files or are cross-referenced under 62 or 105.[15]

B. The 1966 Investigation and the Law Enforcement Purpose Test
The FBI states that in 1966, the investigation of Ferguson "was re-opened based upon receipt of information indicating that plaintiff was a member of the Revolutionary Action Movement (RAM)," and describes RAM as a revolutionary political group. Supp. Superneau Declaration, ¶ 13. This statement and the FBI's contemporaneous characterization of RAM, considered a more radical group, fall short of the standards set by the Supreme Court in Scales v. United States, supra, 367 U.S. at 220, 81 S.Ct. at 1481.
In February of 1967, after having investigated Ferguson and various black nationalist organizations for several years, the FBI described RAM as "a revolutionary nonwhite nationalist group dedicated to the overthrow of the capitalist system in the U.S., by violence if necessary, and to its replacement by a socialistic system oriented toward the Chinese Communist interpretation of Marxism-Leninism." Document 3. Nothing in this characterization indicates present advocacy of intent to overthrow the federal government by imminent aggressive action or criminal violations, or reasonable likelihood of the overthrow of the federal government, as required by Scales, supra. The paraphrased statement in ¶ 13 of the Supp. Superneau Declaration is as conclusory as that made in ¶ 11.
Secondly, the FBI's submissions address the legitimacy of purpose of the investigations of plaintiff only in conclusory terms which are insufficient evidentiary grounds for redaction. Accordingly, there exists a genuine issue of material fact as to which the government has not met its burden. See John Doe Agency, supra, 110 S.Ct. 471, 475 (burden of justifying exemption remains on agency seeking to redact). While "the Government should be given the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure," the "burden remains on the Government under this law." S.Conf. Rep. No. 93-1200, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin. News, at 6285, 6291; H.R.Conf.Rep. No. 93-1380, 93rd Cong., 2d Sess. (1974), reprinted in 120 Cong.Rec. 32597, 32600 (daily ed. September 25, 1974) (Conference Report on the Freedom of Information Act amendments) (emphasis added). Accordingly, the Court will entertain further proof including in camera submissions that records gathered in each of the 1965 and 1966 investigations were compiled for a legitimate federal law enforcement purpose.

II. The Applicability of the Section (b)(7)(D) exemption
As stated by the FBI, "the great bulk of redactions [in all the documents produced] were made pursuant to Exemption (7)(D)." Defendant's Memorandum of Law In Support of Partial Summary Judgment, 45.[16] Even assuming that defendant had met the the threshhold test of proving a "legitimate law enforcement investigation," Abramson, supra, 456 U.S. at 632, 102 S.Ct. at 2065, the agency which seeks to withhold information under exemption (b)(7)(D) has the burden of showing that the release of the information could reasonably be expected to disclose the identity of a confidential source, which is defined as one to whom an express or implied assurance *1093 of confidentiality was made,[17] or "confidential information furnished by the confidential source," in the course of a criminal investigation or a national security intelligence investigation which was itself lawful. Superneau Declaration, ¶ 60; 5 U.S.C. § 552(b)(7)(D).[18]
The harm which exemption (b)(7)(D) seeks to avert is the disclosure, directly or indirectly, of the identities of confidential sources, due to the fact that "the identity of a source may be determined from an analysis of the information furnished by the source." Superneau Declaration, ¶ 63. The FBI states that, under the code (b)(7)(D)-2, it has redacted information supplied by confidential sources, who received an express assurance of confidentiality, as described in ¶ 63. It also states it has redacted the "identities of persons interviewed and information received only from said parties" under the code (b)(7)(D)-3, on the ground that such third parties received "an implied assurance of confidentiality," Superneau Declaration, ¶¶ 65-66, and that the release of information provided by them may tend to reveal their identities. Id., ¶ 68.
The language of the statute and its legislative history, including the 1986 amendments, indicate that to be a confidential source within the exemption, the source must be an actual person, or a "State, local, or foreign agency or authority" or "private institution." (The 1986 amendments specifically added agencies, authorities and institutions to clarify that they could be confidential sources within the exemption.) See, 132 Cong.Rec. H 9455 et seq. (daily ed. October 8, 1986) (statement of Rep. Kindness and text of S.Rept. 98-221). Since the exemptions must be narrowly construed, the Court reads this provision as limited to those categories.
If any of the sources is not a person, institution or state, local or foreign agency or authority, but a technical surveillance device (such as a mail cover or electronic surveillance),[19] then it cannot have received a promise of confidentiality and (b)(7)(D) does not properly apply unless the release of the information thus procured would reasonably lead to the disclosure of the identity of a person, institution or agency who is a confidential source.[20]
Certain documents redacted by the FBI under (b)(7)(D) ("identity and/or information furnished by an FBI source reporting *1094 on a regular basis," Superneau Declaration, at 28) contain multiple statements of the same information. That multiciplicity suggests that each confidential source who provided that information and for whom exemption (b)(7)(D) was asserted was not the only source of that information and reduces the likelihood any connection could be made between the information and the identity of the source. Cf. Lamont, supra, 475 F.Supp. at 780. If the investigatory records had a legitimate purpose, and involved a criminal investigation or a lawful national security intelligence investigation, exemption (b)(7)(D) properly applies to information supplied by each person, institution or state, local or foreign agency which was a confidential source under the statute. If it was any other sort of investigation, the exemption only applies insofar as information released could reasonably be expected to disclose the identity of the confidential source.
The FBI is directed to determine and advise the Court in camera as to the identity and nature of each enumerated source, correlated to each source number, temporary and permanent, of such person, agency or institution which appears in the files produced so far. The FBI is also directed to provide the Court in camera with evidence, based on contemporary documents, demonstrating that the information from a confidential source was compiled in the course of a legitimate criminal investigation, lawful national security intelligence investigation, or other investigation, and in the last-mentioned category, provide the Court with reasons why disclosure of the confidential information provided by the confidential source could reasonably disclose the identity of such a source. If it does not make such disclosure to the Court within 30 days of the date of entry of this Opinion and Order, it shall disclose to plaintiff the information provided by sources which was redacted under this exemption.

III. Breadth of Application of Exemption (b)(7)(D)
Even assuming the FBI's investigation of plaintiff was for law enforcement purposes or qualifies for the (b)(7)(D) exemption as a criminal or lawful national security intelligence investigation, and that each "confidential source" is properly defined as such, the (b)(7)(D) exemptions are asserted too broadly and their application is neither consistent nor always rational. The most flagrant example, Document 49, which contains pages 3-20, redacted in their entirety as allegedly exempt under (b)(7)(D)-4 ("Identities and/or information provided by non-Federal law enforcement agencies," Superneau Declaration, ¶ 32) and under (b)(7)(C)-3 ("Identities and/or information concerning the FBI's investigative interest in a third party," id.). These pages consist entirely of a copy of the indictment against plaintiff and his co-defendants filed in the separate criminal action in New York State Supreme Court, Queens County, brought in 1967 at the same time as the indictment of Ferguson and Harris for conspiracy to murder. It charged Ferguson and sixteen others with advocacy of anarchy, conspiracy to commit advocacy of anarchy, and other violations of state law. Obviously, this material was not intended to be exempt from disclosure under the FOIA.

A. Inconsistencies in redaction of information under (b)(7)(D)
Although the FBI asserts that it may exempt all information provided by a confidential source and has exempted large amounts of such information citing (b)(7)(D)-2, it has not been consistent in its application. The following examples are cited as illustrations of flaws which appear throughout the redactions of the 89 documents. In Document 2, the FBI did not redact large portions of information on p. 3 which were provided by a source asserted to have been confidential, but did redact other information in Document 2 provided by the same source. The FBI also redacts information on some pages of Document 2 which is disclosed elsewhere in Document 2. The FBI must provide the Court with explanations for such inconsistencies. Their presence creates an appearance of arbitrariness and failure to disclose reasonably segregable material, which in turn *1095 presents an issue of fact as to whether the FBI has properly responded to plaintiff's FOIA request, whatever the exemption asserted.
Page 5 of Document 2 also contains several redactions in which the identity of the source was apparently withheld under (b)(7)(C)-5 ("Witnesses and similar third parties interviewed," Superneau Declaration at 13), whereas the information received from that source is claimed to be redacted under (b)(7)(D)-2 ("Identity and/or information furnished by an FBI source reporting on a regular basis," Superneau Declaration at 14). Section (b)(7)(C) provides no authority for withholding information received on this basis from witnesses or third parties. Under the statute, a(b)(7)(C) exemption does not relate to the identity of, or information from, a confidential source but protects the privacy of a party mentioned in the files, including the names of FBI personnel as well as private citizens. Section (b)(7)(D), on the other hand, protects the identity of a confidential source and information supplied by that source under certain circumstances discussed supra. By using (b)(7)(C)-5 to redact and thus protect the identity of the source, the FBI implicitly acknowledges that the source was not a confidential one under (b)(7)(D). The FBI cannot obtain summary judgment with respect to the propriety of redactions by representing to the Court with this type of imprecision that a source is both non-confidential and confidential. Either the source does or does not fall within (b)(7)(D). Information received from non-confidential sources is not exempt. Accordingly, in all instances where this category of inconsistency occurs, the FBI is directed to divulge the content of the information to the plaintiff, and only to withhold the identity of the source of such information after having properly applied (b)(7)(C) and weighed any third party's privacy interest against the public interest in disclosure. Furthermore, released portions of Document 2 indicate that the information discussed supra was gathered by an agent investigating another matter, whose name was redacted under (b)(7)(C), from a third party whose identity was withheld under (b)(7)(C). Either the agent whose name was redacted under (b)(7)(C) was the source of the information in this record, reporting the results of his interview of a third party, or the third party, whose identity is also redacted under (b)(7)(C), was the source. Accordingly, the information itself, which was redacted under (b)(7)(D)-2, does not qualify for that exemption and must be released to plaintiff with redactions only of third parties' names and identifying details.
Document 4 contains another example of flawed application of a(b)(7)(D) exemption. The identities of the persons interviewed or mentioned are designated as withheld to protect their privacy under (b)(7)(C)-5 ("Witnesses and similar third parties interviewed"), whereas the information obtained was also asserted to be exempt under (b)(7)(D)-3, to protect the "identities of persons interviewed and information received only from said parties," under an implied promise of confidentiality. Superneau Declaration, ¶ 65 (emphasis added). However, the information deleted from Document 4 appears not to have been obtained in the course of an FBI interview of the party who was the source of the information, but was obtained as a result of interviews by another agency which was neither the FBI nor a law enforcement agency. The FBI does not and cannot assert that the original source of the information was promised confidentiality, expressly or implicitly, in the course of a criminal or national security investigation, which is a prerequisite of a(b)(7)(D) exemption, since the information appears to have been passed on originally in a conversation that had nothing to do with the FBI or a law enforcement agency. Thus exemption (b)(7)(D) does not apply to the content of the information and while the source's name and some identifying facts may be properly deleted to protect the privacy of the source under (b)(7)(C), the content of the information is not.
Document 10 contains information redacted under exemptions (b)(7)(C)-1 and (C)-5 and (b)(7)(D)-3. However, with the *1096 exception of individuals' names which may be properly redacted, this information is not a report by an informant or interviewee but consists of instructions from one FBI office to another and refers to material disclosed elsewhere to plaintiff. Accordingly, there is no basis under (b)(7)(D) for those redactions of the contents of Document 10 and the FBI is ordered to release that information to plaintiff.

IV. Identities of and Information Furnished by Previously Disclosed Sources, Redacted Under (b)(7)(D) and (b)(7)(C)
Keeping in mind that the purpose of (b)(7)(D), including the exemption for certain information, is to prevent disclosure of the identity of a confidential source (and the fact that the confidential source was providing information about a subject to the FBI), that exemption cannot reasonably apply when the source has testified as to the matters under investigation. As to those matters, the source has waived confidentiality. Bretti v. United States Dep't of Justice, 88-CV-328, Memorandum Opinion, 1990 WL 84366 (N.D.N.Y., June 18, 1990). See also, Payne v. United States Dep't of Justice, 722 F.Supp. 229 (E.D.Pa. 1989), aff'd without opinion, 904 F.2d 695 (3d Cir.1990).

A. Edward Lee Howlette
The Court cannot determine, from the 89 documents reviewed in camera, whether Edward Lee Howlette, the New York Police officer who was the main prosecution witness against Ferguson and Harris, was one of the FBI's confidential sources. If he was, there is no point in withholding his name or reports from release to plaintiff. The facts of his undercover status, his position as a law enforcement officer, his longtime infiltration of RAM and JRPC, and his function as an informant were all exposed during his lengthy testimony and cross-examination at the original trial of Ferguson. These facts were re-publicized and widely circulated after Ferguson returned from exile and was arrested in 1989, as recently as the spring of 1990 when Howlette granted interviews to the press. See Rist, 2 Opposites on Collision Course in '65, Newsday, April 9, 1990, at 6 (city ed.); Rist, After 19 Years, Black Militant Seeks New Trial, id.
In view of these disclosures, none of the dangers which (b)(7)(D), relied on by defendant, is intended to prevent apply to Howlette and that subject matter. Accordingly, his status as a confidential source for purposes of the exemption no longer exists and information of which he was the source, and which is related to his own testimony or the investigation of plaintiff, may not be redacted under (b)(7)(D).
While Howlette might have an interest in non-disclosure under a privacy exemption such as (b)(7)(C), his privacy interest must be balanced against the public interest in disclosure, "tilting the balance in favor of disclosure." Diamond v. FBI, 707 F.2d 75, 77 (2d Cir.1983) (quoting Lamont, supra), cert. denied, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984). The public interest at issue here is the public's right to know the extent of the FBI's surveillance of political dissidents, premised on the notion "that political dissent is dangerous," Diamond v. FBI, 532 F.Supp. 216, 224 (S.D.N.Y.1981), aff'd, Diamond, supra, 707 F.2d 75, and its possible further use of impermissible means to stifle political dissent or opinions with which the FBI or its director disagree. See Ferguson v. FBI, 752 F.Supp. 634, 637 (S.D.N.Y.1990). See also, United States Dep't of Justice v. Reporters Committee, 489 U.S. 749, 772-73, 109 S.Ct. 1468, 1481, 103 L.Ed.2d 774 (1989) (disclosure of document said to be private under (b)(7)(C) turns on nature of document and relationship to FOIA purpose of opening agency action to public scrutiny).
Although it may be true that privacy can be invaded by new disclosure of old information once available to the public, see Rose v. Dep't of Air Force, 495 F.2d 261, 267 (2d Cir.1974) (construing exemption (b)(6); "privacy may be as effectively infringed by reviving dormant memories as by imparting new information"), aff'd sub nom. Dep't of Air Force v. Rose, 425 U.S. *1097 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), Howlette's privacy interest as to these matters is so diminished by his lengthy testimony and recent interviews that it cannot outweigh the public interest in disclosure. See Bretti v. Dep't of Justice, supra. Accordingly, neither his name nor any mention of him may be redacted from any reports under (b)(7)(C).
The FBI is directed to release to plaintiff all reports and all information of which Howlette was the original source, including dates of contact with the FBI and dates contained in any such reports, redacting only eligible codes, file numbers, and other data properly exempt under the statute, together with specific explanations for such redactions.

B. Smithson and Other Disclosed Sources
Document 4 contains another example of information having been redacted which was supplied by a revealed source. The identity of the supplier of the information, Lt. Col. C.R. Smithson, Office of the Assistant Chief of Staff for Intelligence, Department of the Army, is clearly revealed in Document 3 and in Document 4 and is not withheld as that of a confidential source. Released portions of Document 4 state:
Referenced Bulet advised both NY and WFO that Bureau would discuss matter with Army. Information secured from Smithson by Liaison Supervisor Patrick D. Putnam is of interest to both NY and WFO since leads were set out in referenced NYairtel requesting WFO contact National Rifle Association which has chartered the Jamaica Rifle and Pistol Club. Army has close association with National Rifle Association and provides that association with ammunition and weapons for further dissemination to chartered clubs.
Given the repeated mention of Smithson in released portions of the documents (see Document 3), and the disclosure already made that he had provided information to the FBI in this investigation, the Court does not see any compelling reason to redact the content of the information he gave, much of which is alluded to in the released paragraph quoted above. According to defendant, that portion of the document has been referred to the Army for a decision as to whether it should be released. The Court has not been notified as to the Army's decision and does not see that the material is exempt from disclosure. Accordingly, the defendant is ordered to release to plaintiff the above information in Documents 3 and 4, provided by Smithson, and any other information provided by Smithson, but only to the extent that the statutory exemptions to protect other third parties' privacy and other exemptions do not properly apply.
Similarly, Lt. Col. Joseph F. Smith, whose identity and cooperation are not withheld as those of a confidential source but are revealed in detail in Document 47, which states that "Lt. Col. JOSEPH F. SMITH, USAR (Ret) Office of Director of Civilian Marksmanship, Department of the Army, Washington, D.C. arrived at the NYO on 5-16-67 for the purpose of discussing the activities of the JAMAICA RIFLE AND PISTOL CLUB." In view of this disclosure, Smith does not appear to be a confidential source and (b)(7)(D) cannot be asserted to withhold the content of the information Lt. Col. Smith gave to the FBI during such discussions. Such information is redacted from Documents 4-11, passim. The FBI is ordered to release the content of the information to plaintiff, subject to weighing the privacy interest of undisclosed third parties against the public interest in disclosure and the proper application of any other exemptions, which must be supported by affidavit to the Court.
The Court also directs the FBI to determine which identities of non-confidential sources such as witnesses or third parties, or other non-confidential sources, have already been revealed by this and other FOIA proceedings, or by the source itself, and reevaluate whether the source retains a privacy interest in non-disclosure under (b)(7)(C). "[E]vidence of the source's preferences should not be restricted to explicit assent from the source to the government that his involvement be disclosed. Public statements, for example, by the source *1098 about his participation in the FBI's investigation are also good indication that he no longer desires to keep his name and involvement confidential." Diamond v. FBI, supra, 532 F.Supp. at 227. In all instances where the FBI itself or the non-confidential source itself has previously revealed its identity, the FBI is directed to release to plaintiff information provided by those sources for whom the source's privacy interest no longer outweighs the purpose of FOIA and the public interest in disclosure in the instant action.

C. The New York Police Department Bureau of Special Services
Throughout the 89 documents reviewed by the Court, the FBI has applied exemption (b)(7)(D) to redact information provided to the FBI by the New York City Police Bureau of Special Services ("BOSS"). The 1986 amendments to the FOIA specifically provide that a state or local agency, such as a local police department, can be a confidential source under (b)(7)(D).[21] However, in at least two documents reviewed by the Court (Documents 2 and 13), unredacted portions already released to the plaintiff clearly identify BOSS as regularly passing on information to the FBI in this particular investigation of the plaintiff. See, e.g., Document 2, at 8. While it may be proper to withhold the names of BOSS personnel or informants under other exemptions, such as (b)(7)(C), all the content of BOSS reports to the FBI under (b)(7)(D) should not be withheld on the grounds that BOSS is a confidential source, since the FBI has already disclosed that BOSS was an regular source in this particular matter. BOSS was responsible for the investigation and prosecution of the Panther 21, the longest criminal trial ever held in New York State, which ended in acquittal of all twenty one defendants after two hours of jury deliberations. See Zimroth, Perversions of Justice, supra, note 2. In at least one case, much BOSS information was unrelated to any criminal activity and was exculpatory. People v. Collier, supra, 376 N.Y.S.2d 954 (1975). Accordingly, the FBI is directed to provide the Court with assembled, unredacted copies of all information provided by BOSS, together with specific explanations of why such information should be exempt under (b)(7)(D).

D. Sources Who May Be Dead
Like the documents at issue in Diamond v. FBI, supra, 532 F.Supp. 216, many of the documents in plaintiff's FBI files are decades old. Due to the age of these documents and "the likelihood that their age has affected the privacy interests at stake, it is appropriate to require defendant[] to ascertain in this case if the [sources'] privacy is still at issue." Id. at 227.
As Judge Carter ordered in Diamond, supra, the FBI is directed to search its files pertaining to the sources redacted under (b)(7)(C), not just the files which it considers responsive to this plaintiff's FOIA request, to determine if any of those sources are now dead. Id. The FBI will then submit an affidavit to the Court, detailing its search of the FBI's files and stating, with respect to each source, third party, interviewee, etc., whose identity was withheld under (b)(7)(C), whether the files indicate that the source is dead or alive or if it cannot be determined. If any of those persons is dead, the FBI is ordered to release to plaintiff all material related to each such source.

E. Other Material Redacted Under (b)(7)(D)

1. Pamphlets, Leaflets, and Other Public Documents

The 89 documents reviewed in camera include materials, redacted in their entirety, which consist of leaflets prepared by supporters of Ferguson and his co-defendants, which were apparently distributed in the city to increase sympathy for them and to raise funds for their defense. An example is Document 77, entirely redacted *1099 under (b)(7)(D)-2. There appears to be no justification for withholding this document, which was clearly distributed on the streets of New York to the general public. The FBI is ordered to release to plaintiff all records in its files which consist of pamphlets, leaflets or other publicly circulated material, including the attachments to Documents 62, 65, 68, 70, 77, 81, 87 and 88.

2. Reports of Public Meetings

The 89 documents also contain, passim, reports of public rallies and meetings which, according to the reports themselves, were attended by many people.[22] Those reports have been redacted in their entirety, seemingly without an effort to release "reasonable segregable portion[s]." 5 U.S.C. § 552(b). Nor is there any explanation of why disclosure of these reports "could reasonably be expected to disclose the identity of a confidential source," since any bystander or passerby could have gathered the same information at these public gatherings. Accordingly, the FBI is directed to release to plaintiff all such reports, after proper application of (b)(7)(C) as discussed supra, or to explain to the Court why disclosure of any such reports would lead to the enumerated harm of disclosure which exemption (b)(7)(D) is meant to prevent.
For all the reasons stated above, and because of the serious issues of material fact discussed above, defendant's motion for partial summary judgment is denied.

V. Plaintiff's Motion For Reprocessing Or To Compel Discovery
Having denied defendant's motion for partial summary judgment, the Court is confronted with the question of how to proceed and whether it should compel reprocessing or discovery as requested by plaintiff. The latest FOIA request involved in this action has been in process since 1989. Plaintiff's challenge to his original conviction has been stayed pending a resolution of the FOIA action and he is awaiting that resolution in state prison. To order discovery as to search procedures would not expedite the proper release of files in accordance with the statute. To direct reprocessing only would invite a repetition of the last year's exercises in motion practice. Accordingly, the Court orders the defendant to produce to the Court, within thirty days of the date of entry of this Opinion and Order, its files on Ferguson, for in camera review in their entirety, in unredacted form. The Court will conduct a de novo review of these files and will release those portions as to which the FBI has not met its burden of justifying their redaction under the strict mandates of the Freedom of Information Act and grant summary judgment as to the rest. The Court will require the FBI to submit additional affidavits as needed, if any, during the course of the in camera review.
Because the Court will review the FBI's files to ensure proper compliance with the FOIA, discovery and reprocessing would serve no purpose at this point. Accordingly, plaintiff's motions to compel discovery and to direct reprocessing are denied without prejudice to later renewal. Cf. Diamond, supra, 532 F.Supp. at 227.

CONCLUSION
After in camera review of 89 documents, the Court finds that the FBI has failed to justify its assertion of (b)(7) exemptions. The FBI has also applied the asserted (b)(7) exemptions too broadly to the documents reviewed, with inconsistencies and a failure to support their application in accordance with the statutory mandate. Accordingly, there are issues of fact as to whether the FBI has also over-redacted the other documents it produced in response to plaintiff's request, whatever the exemption asserted, including those which do not appear in the 89 documents reviewed in camera by the Court. Whether all the records in which redactions were made under the (b)(7)(D) exemption meet the statutory requirements of that specific *1100 provision is also an issue of fact. Accordingly, defendant's motion for partial summary judgment is denied.
Because of the serious flaws in defendant's application of the exemptions reviewed, the Court will review its entire production to date in camera. "[A] finding of bad faith or contrary evidence is not a prerequisite to an in camera review; a trial judge may order such an inspection `on the basis of an uneasiness, a doubt he wants satisfied ...'" Meeropol v. Meese, 790 F.2d 942, 958 (D.C.Cir.1986) (quoting Ray v. Turner, 587 F.2d 1187, 1195 (D.C. Cir.1978). The Court is made very uneasy as to whether defendant has properly applied the statutory exemptions, after its limited in camera review of 89 documents.
Since the Court will conduct an in camera review of the entire document production, plaintiff's motion to compel discovery is denied without prejudice to renewal. Plaintiff's motion to direct reprocessing is granted to the extent delineated above. The motion for another Vaughn index is moot, since the Court will review the documents.
The FBI is directed to release portions of its files as specified above. The FBI is also directed to submit unredacted copies of its files, marked in the same way as the 89 documents produced in December, 1990, for the Court's in camera review, within thirty days of the date of entry of this Opinion and Order.
IT IS SO ORDERED.
NOTES
[1] Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
Fed.R.Civ.P. 56(f).
[2] The functions of the New York City Police Bureau of Special Services ("BOSS") during the 1960's and 70's have been described in several court decisions, most notably People v. Collier, 85 Misc.2d 529, 376 N.Y.S.2d 954, 960-61 (N.Y. Sup.Ct.1975). See also, Handschu v. Special Services Division, 605 F.Supp. 1384, 1396-99 (S.D. N.Y.1985) (Haight, J.). The Collier court noted the infiltration of RAM by BOSS agent Ray Wood, whom it described as having been a member of RAM "until the work of other agents led to the arrest of sixteen members for planning to assassinate Roy Wilkens [sic], Whitney Young, Jr., and others." 376 N.Y.S.2d at 961 (quoting Zimroth, Perversions of Justice: The Prosecution and Acquittal of the Panther 21 (Viking, 1974), which relies on the account of Anthony Bouza, a former BOSS official). "[BOSS's] function remained essentially the same  to investigate and control trouble-making subversives, whoever they may be." 376 N.Y.S.2d at 960.
[3] "COINTELPRO" was the name given to a long-standing FBI program of counter-intelligence. At first largely aimed at disrupting the Communist Party and socialist groups in the United States, COINTELPRO's activities in the 1960's included the infiltration and disruption of the Ku Klux Klan, the civil rights movement and black nationalist groups, among others. See United States v. Shakur, 1988 WL 34828, 1988 U.S.Dist.LEXIS 2762 (Mem.Op., April 5, 1988) (Haight, J.); United States v. Buck, 84 Cr. 220 (CSH) (Slip Opinion, December 12, 1986), nn. 1-2 and accompanying text; Socialist Workers' Party v. Attorney General, 642 F.Supp. 1357, 1383-96 (S.D.N.Y.1986).
[4] Throughout this Opinion, the 89 documents produced for in camera review are referred to by their numbers in the in camera production, e.g., Document 1, Document 2, etc.
[5] The other exemptions under 5 U.S.C. 552(b), not relevant to this Opinion, apply to "matters that are 

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;
(2) related solely to the internal personnel rules and practices of an agency;
(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;
(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
* * * * * *
(8) contained in or related to examination, operating or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or
(9) geological and geophysical information and data, including maps, concerning wells.
[6] While there cannot be a per se rule of disclosure of documents over a certain age, Diamond v. FBI, 707 F.2d 75 (2d Cir.1983), the fact of their age is highly relevant to the reasonable application of any exemption.
[7] The decision in Doherty must be read in conjunction with the Second Circuit's prior decision in Williams v. FBI, 730 F.2d 882 (2d Cir.1984), which held that the phrase "for law enforcement purposes" was a general description of the type of record and that purpose of an FBI investigation should not be held to fall outside the bounds of "law enforcement purposes" upon the substituted judgment of a magistrate or judge which is subject to "the vagaries of judicial hindsight as to the merits or wisdom of an investigation." 730 F.2d at 885.
[8] 18 U.S.C. §§ 2383-85 prohibit rebellion or insurrection, seditious conspiracy, and advocating the overthrow of the government. 50 U.S.C. §§ 781 et seq. codified the Internal Security Act of 1950 and the Subversive Activities Control Act of 1950, as amended by the Communist Control Act of 1954 and later amendments.
[9] Defendant's citation of criminal statutes which were enacted years after the surveillance of this individual began raises the serious question of whether the FBI actually did, at the time it started the investigation, suspect a possible violation of any of the federal laws cited, or whether this is a present-day re-creation of the FBI's reasons for investigating Mr. Ferguson, made in retrospect.
[10] Part of this statute consists of the Subversive Activities Control Act at issue in Lamont, supra, 475 F.Supp. 761.
[11] Indicia of whether the investigation bore a reasonable connection to legitimate federal law enforcement purposes and not political monitoring, appear in the classification headings of the investigative file numbers. Classifications 32 and 88, for example, and the cited statutory authority for investigating plaintiff under the latter heading, clearly indicate a reasonable relation to a criminal investigation of this plaintiff, dealing as they do with Identification and Fugitives. On the other hand, Classifications 62, 100, 105 and 157 (Miscellaneous, Internal Security or Security Matters, and Racial Matters) do not indicate that these files were assembled in the investigation of a potential violation of federal law, criminal or civil, but rather that they involved investigations related to national security.
[12] Two file numbers, XXX-XXXXXX and XXX-XXXXXX, appear on the document; there is also a sub-caption under Ferguson's name which reads "SM-MISCELLANEOUS". The classification number 100 together with "SM" indicates that the investigation was to be filed among "Security Matters."
[13] By 1963, the United States Supreme Court had, in several famous cases of the era, strictly limited the reach of the Smith Act, Internal Security Act, Subversive Activities Control Act and state sedition laws, and "fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 446-47, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (reciting history of cases such as Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (limiting reach of Smith Act), Yates v. United States, 354 U.S. 298, 320-24, 77 S.Ct. 1064, 1077-80, 1 L.Ed.2d 1356 (1957) (overturning convictions under Smith Act because jury had not been instructed that mere advocacy of forcible overthrow of government was not criminal), overruled on other grounds, Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); and Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961) (abstract teaching of moral propriety or necessity for violence is not the same as preparing for and steeling to violent action)). See also, Scales v. United States, 367 U.S. 203, 220, 81 S.Ct. 1469, 1481, 6 L.Ed.2d 782 (1961) (summarizing Yates decision as it applied to Smith Act, Internal Security Act and Subversive Activities Control Act). Contemporaneous law relevant to the OAAU and other political organizations would not have rendered the OAAU's activities criminal.
[14] Exhibit 11 to the Gibbs Declaration indicates that the FBI's investigation of Mr. Ferguson may have begun as early as the summer of 1963, a year before the OAAU was founded. No reason is given for the commencement of the monitoring.
[15] 100 and 157 are numbers of main files on plaintiff; 62 and 105 are the numbers of two other "investigative classifications" identified as containing the cross references to plaintiff. See Superneau Declaration, ¶ 18.
[16] The FBI uses numbered subdivisions of the statutory exemptions which will appear throughout this Opinion. For example, exemptions under (b)(7)(D) appear in the redacted documents as (b)(7)(D)-1, (b)(7)(D)-2, etc. Where a dash and a number appear after the statutory exemption, this denotes that an administrative subdivision of the statutory exemption is cited. The subdivisions are described in the Superneau Affidavit.
[17] The Second Circuit has adopted a "functional" approach to the (b)(7)(D) exemption. A promise of confidentiality may be express or implied. An implied promise of confidentiality may be found when "it is apparent that the agency's `investigatory function depends for its existence upon information supplied by individuals who in many cases would suffer severe detriment if their identities were known.'" Donovan v. FBI, 806 F.2d 55, 61 (2nd Cir.1986) (quoting Diamond v. FBI, 707 F.2d 75, 78 (2nd Cir.1983), cert. denied, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984)).
[18] If the investigatory records were not compiled for a legitimate law enforcement purpose, as discussed supra, no exemption under 552(b)(7) properly applies.
[19] The FBI's submissions indicate, for example, that source numbers may have been assigned to particular surveillance installations monitored by FBI field offices. Superneau Declaration, February 16, 1990, ¶¶ 9, 36. The fact that an ELSUR (electronic surveillance) or "June Mail" file has been released in redacted form to plaintiff indicates that there may have been, for example, wiretaps or other electronic surveillance of Mr. Ferguson. Without express representation by the FBI, the Court has no way to determine whether redacted information from a particular source number came from an actual "confidential source" within the meaning of the statute or from a wiretap or other technical surveillance source, electronic or non-electronic. For examples of FBI surveillance techniques at the time, see, e.g., Socialist Workers Party, supra, passim.
[20] Unredacted segments of the file on Mr. Ferguson include contemporary newspaper reports about his trial, which report that Edward Howlette, the undercover New York police officer who had infiltrated the Jamaica Rifle and Pistol Club and testified against Mr. Ferguson at his trial, had electronic surveillance devices both on his person and in his car. The FBI cannot assert the (b)(7)(D) exemption unless it shows that releasing the information from the non-human source could reasonably be expected to disclose the identity of a person, agency, authority or private institution as a confidential source as discussed above. See also the discussion of confidential sources whose identities have already been disclosed, infra, including Edward Howlette.
[21] The Second Circuit, in Keeney v. FBI, 630 F.2d 114 (2d Cir.1980), criticized the argument that prior disclosure of the local agency's identity deprived it of its confidential status because its identity was no longer "secret." The sole issue before the court was whether the term "confidential source" could include local law enforcement agencies. Id.
[22] Cf. Lamont, supra, 475 F.Supp. at 775 (reports of alleged subversive's speeches, publications and other lawful public activities not reasonably related to FBI's law enforcement duties).